The CHIEF JUSTICE delivered the opinion of the court.
We have considered the case with much care, not only upon the ship’s papers and the preparatory proofs, but upon the documents invoked on the hearing in the District Court from’ the two causes, United States v. The Steamer Gertrude, and United States v. The Schooner Stephen Hart, then pending in that court.
The invocation of these documents appears to have been made at the original hearing, and we cannot say that this was strictly regular. It would have been more in accordance with the rules of proceeding in prize if the cause had been first fully heard on the ship’s documents and the preparatory proofs, and if invocation had been allowed, especially to the captors, only in case of the disclosure of suspicious circumstances on that hearing. But there was no such irregularity as was inconsistent with the lawful exercise of the discretion of the court, and none which would justify us in reversing the decree below'because of the allowance of the invocation, or in refusing tó look at the documents invoked and now part of the record. Especially should we not be justified in such refusal, after being made aware by the record that the steamship Gertrude was so manifestly good prize that no claim was ever interposed for her or her cargo, and after *21 having, at the last term, condemned the Stephen Hart and her cargo by our own decree.
We have, therefore, looked into all the evidence, and will now dispose of the case.
We have already held in the case of the Bermuda, where goods, destined ultimately for a belligerent port, are being conveyed between two neutral ports by a neutral ship, under a charter made in good faith for that voyage, and without any fraudulent connection on the part of her owners with the ulterior destination of the goods, that the ship, though liable to seizure in order to the confiscation of the goods, is not liable to condemnation as prize.
We think that the Springbok fairly comes within this rule. Her papers were regular, and they all showed that the voyage on which she was captured was from London Nassau, both neutral ports within the definitions of neutrality furnished by the international law. The papers, too, were all genuine, and there was no concealment of any of them and no spoliation. Her owners were neutrals, and rlo not appear to have had any interest in the cargo; and there is no sufficient proof that they had any knowledge of its alleged unlawful destination.
It is true that her shipping articles engaged the crew for' the voyage, not only from London to Nassau, but also from thence, if required,, to any other port of the West India Islands, American States, British North America, and .other named countries, and finally to a port in the United Kingdom); and it is also true that this engagement would include, should the master undertake it, a continuance of the voyage for the conveyance of the cargo from Nassau to a blockaded port; but there is no proof that there was any engagement for such continuance of the voyage. On the contrary, the charter-party, which has the face, at least, of an honest paper, stipulated for the delivery of the cargo at Nassau, where, so far as is shown by that document, the connection of the Springbok with it was to end.
The preparatory examinations do not contradict but rather sustain the papers.
*22 The testimony of the master was that the vessel was destined to and for Nassau to deliver her cargo and return to the United Kingdom, and that her papers were entirely true and fair. And his testimony in this regard is corroborated by that of the other witnesses.
It is said, however, that the master, upon his examination, declared himself to have been ignorant of the real ownership of the cargo, and that this indicates' unlawful intent. But it must be remembered that the master of the Springbok had a clear right to convey neutral goods of all descriptions, including contraband, from' London to Nassau, subject to the belligerent right of seizure in order to confiscation of contraband, if found on board and proved to be in transit to the hostile belligerent. On the hypothesis, therefore, that the cargo was to be actually delivered at Nassau, without an ulterior destination known to and promoted by the master or owners, in-bad faith, we cannot say that the master’s ignorance of its ownership is an important circumstance in the ease.
There is more weight in the argument for condemnation derived from the misrepresentation of the master concerning his knowledge of the cause of seizure. The master testified that he did not know when examined on what' pretence the capture was made, while the mate and the steward deposed that they understood that the vessel was captured under the supposition that the cargo was contraband, and the boatswain testified that it was because the bills of lading did not show the contents of some of the cases.
The master must have known as much about the cause of capture as either of the witnesses; and his misrepresentation of the truth in this instance brings his statements concerning the real destination of the ship and the intention to deliver her cargo at Nassau into some discredit. Frankness and truth are especially required of the officers of captured vessels when examined in preparation for the first hearing in prize. And the clearest good faith may very reasonably be required of those engaged in alleged neutral commerce with a port constantly and notoriously used as a port of call and *23 transshipment by persons engaged in systematic violation of blockade and in the conveyance of contraband of war. That Nassau was such a port is not only known from evidence before the prize courts, but from the official correspondence between the English and American governments^ and the fact was distinctly stated by Earl Bussell, then Foreign Secretary in the British ministry, in an answer, dated July 5th, 1862, to a communication from the shipowners of Liverpool.*
If, therefore, the case of the claimants of-the ship depended wholly upon the testimony of the master, we should find it difficult to resist the argument for condemnation. But it does not depend wholly or mainly on that statement. The fairness of the papers, the apparent good faith of the stipulations of the charter-party in favor of the owners, and the testimony of the other witnesses, restrain us from harsh inferences against the owners of the vessel, who seem to be in no way compromised with the cargo, except through the misrepresentations of the master, and are not shown to have been connected with any former violation of neutral obligations.
In consideration of the master’s misrepresentation, however, and of the circumstance that he signed bills of lading which did not state truly and fully the nature of the goods contained in the bales and cases mentioned in them, we shall, whije directing restoration of the ship, allow no costs oi damages to the claimants.
The case of the cargo is quite different from that of the ship.
The cargo was shipped at London in November and December, 1862, in part by Moses Brothers and the remainder by Speyer and Haywood.
The bills of lading, three in number, show no interest in any other person.
The charter-party was made by the master with one Begbie, and stipulated that the ship should take on board a cargo *24 of lawful merchandise goods and deliver the same at Nassau to the charterers’ agent at that port.
On completion of the lading on the 8th of December, Speyer and Haywood, subscribing themselves as agents for the charterers, addressed a note to the master directing him to proceed at once to Nassau, and on arrival report himself to B. W. Hart there, who would give him orders as to the delivery of the cargo and any further information he might, require.
The bills of lading disclosed the contents of six hundred and nineteen, but concealed the contents of thirteen hundred and eighty-eight, of the two thousand and seven packages which made up the cargo. Like those in the Bermuda case they named no consignee, but required the cargo to be delivered to order or assigns. The manifest of the cargo also, like that in the Bermuda case, mentioned no consignee, but described the cargo as deliverable to order. Unlike those bills and that manifest, however, these concealed the names of the real owners as well as the contents of more than two-thirds of the packages.
Why were the contents of the packages concealed ? The owners knew that they were going to a port in the trade with which the utmost candor of statement might be reasonably required. The adventure was undertaken several months after the publication of the answer of Earl Bussell to the Liverpool shipowners already- mentioned. In that answer the British foreign secretary had spoken of the allegations by the American government that ships had been sent from England to America with fixed purpose to run the blockade, and that arms and ammunition had thus been conveyed to the Southern States to aid them in the war; and he had confessed his inability either to deny the allegations or to prosecute the offenders to conviction; and he had then distinctly informed the Liverpool memorialists that he could not be surprised that the cruisers of the United States should watch with vigilance a port which was said to be the great entrepót of this commerce. Eor the concealment of the character of a cargo shipped for that entrepót, after such a *25 warning, no honest reason can be assigned. The true reason must be found in the desire of the owners to-hide from the scrutiny of the American cruisers the contraband charactér of a considerable portion of the contents of those packages.
And why were the names of those owners concealed ? Can any honest reason be given for that? None has been suggested. But the real motive of concealment appears at once when we learn, from the claim, that Isaac, Campbell & Co., and Begbie were the owners of the cargo of the Springbok, and from the papers invoked, that Begbie was the owner of the steamship Gertrude, laden in Nassau in April, 1863, with a cargo corresponding in several respects with that now claimed by him and his associates, and despatched on a pretended voyage to St. John’s, New Brunswick, but captured for unneutral conduct and abandoned to condemnation, without even the interposition of a claim in the prize court; and when we learn further from the same papers that Isaac, Campbell & Co., were the sole owners of the cargo of the Stephen Hart, consisting almost wholly of arms and munitions of war, and sent on a pretended destination to Cardenas, but with a real one for the States in rebellion. Clearly the true motive of this concealment must have been the apprehension of the claimants, that the disclosure of their names as owners would lead to the seizure of the ship in order to the condemnation of the cargo.
We are next to ascertain the real destination of the cargo, for these concealments do not, of themselves, warrant condemnation. If the real intention of the owners was that the cargo should be landed at Nassau and incorporated by real sale into the common stock, of the island, it must be restored, notwithstanding this misconduct.
W hat then was this real intention ? That some other destination than Nassau was intended may be inferred, from the fact that the consignment, shown by the bills of lading and the manifest, was to order or assigns. Under the circumstances of this trade, already mentioned, such a consignment must be taken as a negation that any sale had been' *26 made to any one at Nassau. It must also be taken as a negation that any such sale was intended to be máde there; for had such sale bben intended, it is most likely that the goods would have been consigned for that purpose to some established house uamed in the bills of lading.
This inference is strengthened by the letter of Speyer & Haywood to the master, when about to sail from London. That letter directs him to report to B. W. Hart, the agent of the charterers at Nassau, and receive his instructions as to the delivfery of the cargo. The property in it was to remain unchanged upon delivery. The agent was to receive it and execute the instructions of his principals.
What these instructions were may.be collected, in part, from the character of the cargo.
A part of it, small in comparison with the whole, consisted of arms and munitions of war, contraband-within the narrowest definition. Another and somewhat larger portion consisted of articles useful and necessary in war,'and therefore contraband within- the constructions of the American and English prize courts. -These portions being contraband, the residue of the cargo, belonging to the same owners, must share their fate.*
But we do not now refer to the character of the cargo for the purpose of determining whether it was liable to condemnation as contraband, but for the purpose of ascertaining its real destination; for, we repeat, contraband or not, it could not be condemned, if really destined for Nassau and not beyond; and, contraband or not, it must be condemned if destined to any rebel port, for all rebel ports were under blockade.
Looking at the cargo with this view, we find that a part of it was specially fitted for use in the rebel military service, and a larger part, though- not so specially fitted, was yet well adapted to such use. Under the first head we include the sixteen dozen swords, and the ten dozen rifle-bayonets, and *27 the forty-five thousand navy buttons, and the one hundred and fifty thousand army buttons; and, under the latter, the seven bales- of army cloth and .the twenty bales of army blankets and other similar goods. We cannot’ look at such a cargo as this, and doubt that a considerable portion of. it was going to the rebel States, where alone it could be used; nor can we doubt that the whole cargo had one destination.
Now if this cargo was not to be carried to its ultimate destination by the Springbok (and the proof does not war- ' rant us in saying that it was), the plan must have been to send it forward by transshipment. And we think it evident that such was the purpose. We have already referred to the bills .of lading, the manifest, and the letter of Speyer & Haywood, as indicating this intention; and the same inference must be drawn from the disclosures by the invocation, that Isaac, Campbell & Co., had before supplied military goods to the rebel authorities by indirect shipments, and that Begbie was owner of the Gertrude and engaged in the business of running the blockade.
If these -circumstances were insufficient grounds for a satisfactory conclusion, another might be found in the presence of the Gertrude in the harbor of Nassau with undenied intent to run the blockade, about the time when the arrival of the Springbok was expected there.. It seems to us extremely probable that she had been sent to Nassau to await the arrival of the Springbok and to convey filer cargo to a belligerent and blockaded port, and that she did hot so convey it, only because the voyage was intercepted by the capture.
All these condemnatory circumstances must be taken in connection with the fraudulent concealment attempted in the bills of lading and the manifest, and with the very remarkable fact that not only has no application been . made by the claimants for leave to take further proof in order to furnish some explanation of these circumstances, but that no claim, sworn to personally, by either of the claimants, has ever been fled.
Upon the whole case we cannot doubt that the cargo was *28 originally shipped with intent to violate the blockade; tha,t the owners, of the cargo intended that it should be transshipped at Nassau into some vessel more likely to succeed in .’reaching safely a blockaded port than the Springbok; that the voyage from London to the blockaded port was, as to cargo, both -in law and in the intent of the parties, one voyage.; and that the liability to condemnation, if captured during any part of that voyage, attached to the cargo from the time of sailing.
The decree of the District Court, must, therefore, be reversed as to ■ the ship, but without costs or damages to the claimants, and must be affirmed as to the cargo; and the cause must be remanded for further proceedings
In conformity with this opinion;

 July 19th, 1862, Lawrence’s Wheaton, 719.

 The Immanuel, 2 Robinson, 196; Carrington v. Merchants’ Insurance Co., 8 Peters, 495.