13-4533 (L)
*Expressions Hair Design v. Schneiderman*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2014

(Argued: March 5, 2015      Decided: September 29, 2015
Amended: December 11, 2015)

Nos. 13-4533, 13-4537

————————————————————

EXPRESSIONS HAIR DESIGN, LINDA FIACCO, THE BROOKLYN FARMACY & SODA FOUNTAIN, INC., PETER FREEMAN, BUNDA STARR CORP., DONNA PABST, FIVE POINTS ACADEMY, STEVE MILLES, PATIO.COM LLC, DAVID ROSS,

*Plaintiffs-Appellees*,

-v.-

ERIC T. SCHNEIDERMAN, in his official capacity as Attorney General of the State of New York, CYRUS R. VANCE, JR., in his official capacity as District Attorney of New York County, CHARLES J. HYNES, in his official capacity as District Attorney of Kings County,

*Defendants-Appellants*.

————————————————————

Before:      WESLEY, LIVINGSTON, and CARNEY, *Circuit Judges*.

Defendants appeal from a November 4, 2013 judgment of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) declaring

that New York General Business Law § 518, which prohibits sellers from imposing a surcharge on customers who use credit cards, violates the First Amendment and is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment, and enjoining Defendants from enforcing the surcharge prohibition against Plaintiffs. We conclude that the district court erred in holding that § 518 violates the First Amendment and the Due Process Clause. We therefore vacate the judgment and remand for dismissal of Plaintiffs' claims.

VACATED AND REMANDED.

JUDITH VALE, Assistant Attorney General (Barbara D. Underwood, Solicitor General, Steven C. Wu, Deputy Solicitor General, *on the brief*), *for Defendant-Appellant Eric T. Schneiderman, in his official capacity as Attorney General of the State of New York.*

Larry A. Sonnenschein, Ronald E. Sternberg, *for* Zachary W. Carter, Corporation Counsel of the City of New York, *for Defendants-Appellants Cyrus R. Vance, Jr., in his official capacity as District Attorney of New York County, and Charles J. Hynes, in his official capacity as District Attorney of Kings County.*

Henry C. Meier, Associate General Counsel, *for Amicus Curiae Credit Union Association of New York in support of Defendants-Appellants.*

DEEPAK GUPTA, Gupta Beck PLLC, Washington, DC (Gary Friedman, Friedman Law Group, LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellees*.

Linda P. Nussbaum, Grant & Eisenhofer, P.A., New York, NY, *for Amici Curiae The Kroger Company, Safeway Inc., Walgreen Co., Food Lion, LLC, Hy-Vee Inc., H.E. Butt Grocery Co., The Great Atlantic & Pacific Tea Co., Inc., Albertson's LLC, and Rite Aid Corp., in support of Plaintiffs-Appellees.*

J. Douglas Richards, Cohen Milstein Sellers & Toll PLLC, New York, NY, *for Amici Curiae Consumer Action, National Association of Consumer Advocates, National Consumers League, and U.S. Public Interest Research Group, in support of Plaintiffs-Appellees.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

New York General Business Law § 518 ("Section 518") provides that "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." Plaintiffs-Appellees in this action ("Plaintiffs") are five New York businesses and their owners and managers.[1] They sued the Attorney General of the State of New York and the

---

[1] Plaintiffs are Expressions Hair Design, a unisex hair salon in Vestal, New York, and its co-owner, Linda Fiacco; The Brooklyn Farmacy & Soda Fountain, Inc., an ice-cream parlor in Brooklyn, and its co-founder, Peter Freeman; Bunda Starr Corp., which owns a Manhattan liquor store, and its president, Donna Pabst; Five Points Academy, a Manhattan martial arts studio, and its vice president, Steve Milles; and Patio.Com LLC, an outdoor furniture and billiards company with stores throughout New York, and its founder and president, David Ross.

3

District Attorneys of New York County and Kings County (collectively, "New York") in the United States District Court for the Southern District of New York, claiming that Section 518 violates the First Amendment's Free Speech Clause and is void for vagueness under the Fourteenth Amendment's Due Process Clause. The district court (Jed S. Rakoff, *Judge*) agreed with Plaintiffs on both counts, and eventually entered a final judgment declaring Section 518 unconstitutional and permanently enjoining New York from enforcing the law against Plaintiffs. On appeal, we conclude that the application of Section 518's text to surcharges added to single sticker prices violates neither the First Amendment nor the Due Process Clause. We further decline to address other applications, invoking *Pullman* abstention. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). We therefore vacate the judgment entered by the district court and remand for dismissal of Plaintiffs' claims.

## BACKGROUND

### A. "Swipe Fees" and Credit-Card Surcharges

Every time a consumer pays for goods or services with a credit card, the credit-card issuer charges the merchant a percentage of the purchase price. (The parties and literature refer to these fees as "swipe fees" or "merchant-discount

4

fees.") The typical fee is two to three percent of the transaction amount. Plaintiffs and other businesses that chafe at these fees would like to pass them along to consumers while also making consumers aware of the charge in an effort to convince them to pay cash. Accordingly, they would like to charge more than their regular price to customers who use credit cards; that is, they would like to impose a "surcharge" on credit-card users. Another way of passing the cost of credit along to customers is to offer a discount from the regular price to customers who use cash. While these two means of passing along the cost of credit may seem equivalent (in that they both ultimately result in credit-card customers paying more than cash customers), differences between them have led to a series of efforts by both credit-card companies and legislators to prohibit credit-card surcharges specifically.

One difference between credit-card surcharges and cash discounts involves consumers' reactions to them. A psychological phenomenon known as "loss aversion" means that "changes that make things worse (losses) loom larger than improvements or gains" of an equivalent amount. Daniel Kahneman et al., *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persp. 193, 199 (1991). For this reason, credit-card surcharges are more effective than cash discounts at discouraging credit-card use among consumers, which has naturally led

5

credit-card companies to oppose them. *See* Richard Thaler, *Toward a Positive Theory of Consumer Choice*, 1 J. Econ. Behav. & Org. 39, 45 (1980). But some consumer advocates and lawmakers, too, have favored protecting consumers from the inconvenience and annoyance of having extra charges added to their bills, and have also suggested that discouraging credit-card use may have adverse economic effects on the broader economy by "dampen[ing] retail sales." J.A. 114.

According to proponents of prohibitions on credit-card surcharges, experience also suggests that such surcharges will tend to exceed the amount necessary for the seller to recoup its swipe fees, meaning that sellers will effectively be able to extract windfall profits from credit-card users.[2] By contrast, cash discounts are unlikely to lead to the same problem, because merchants will not set the amount of the discount higher than the marginal cost of credit. *See, e.g.*, Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1352 (2008) ("[M]erchants' ability to discount is limited by the spread between the credit price and the merchandise cost to the merchant. If the merchant offers discounts by more than that spread, the merchant will lose money on the transaction. Merchants might

---

[2] When credit-card surcharges were legalized in Australia, for example, they rose to about twice the amount that sellers actually had to pay in swipe fees, despite predictions that competition among sellers would prevent this from happening.

need to increase the credit price to create a sufficient spread to profitably offer a discount that affects consumer behavior."). Further, because credit-card surcharges (unlike cash discounts) offer a means of increasing customers' bills, dishonest sellers may attempt to profit at their customers' expense by imposing surcharges surreptitiously at the point of sale.

**B. The Lapsed Federal Ban on Credit-Card Surcharges**

New York enacted Section 518 in 1984. Because the law's enactment was motivated by the expiration of a federal law that prohibited credit-card surcharges, we briefly recount the history of that federal law.

In the early days of credit cards, credit-card issuers' contracts with merchants prohibited merchants from charging different amounts to customers who used credit cards and those who used other methods of payment. In 1974, however, Congress amended the federal Truth in Lending Act ("TILA") to protect merchants' ability to offer their customers discounts for using cash. *See* Fair Credit Billing Act § 167, Pub. L. No. 93-495, tit. III, 88 Stat. 1500 (1974) (codified in relevant part at 15 U.S.C. § 1666f(a)) (providing that issuers could not "prohibit . . . seller[s] from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card"). In the same amendments, Congress

7

also provided that these protected cash discounts did not rank as "finance charges" governed by TILA's disclosure requirements. *Id.* In 1975, the Federal Reserve Board (the "Fed") promulgated a regulation clarifying that the statutory exemption from TILA's disclosure requirements did not also apply to credit-card surcharges. *See Fair Credit Billing, Description of Transactions*, 40 Fed. Reg. 43,200, 43,203 (Sept. 19, 1975). In 1976, Congress again amended TILA to both ratify the Fed's interpretation and ban credit-card surcharges entirely. *See* An Act to Extend the State Taxation of Depositories Act, Pub. L. No. 94-222, 90 Stat. 197 (1976) (the "1976 Amendments"). Specifically, the 1976 Amendments provided: "[n]o seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means." *Id.* § 3(c)(1). Moreover, to clarify the distinction between protected discounts and newly unlawful surcharges, the 1976 Amendments defined the term "surcharge" as "any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash, check, or similar means"; defined the term "discount" as "a reduction made from the

8

regular price"; and clarified that a discount "shall not mean a surcharge."[3] *Id.* § 3(a) (codified in relevant part at 15 U.S.C. § 1602(q), (r)).

The 1976 Amendments' ban on credit-card surcharges was initially set to expire in 1979, but in 1978, Congress extended it until 1981. *See* Financial Institutions Regulatory & Interest Rate Control Act § 1501, Pub. L. No. 95-630, 92 Stat. 3641 (1978). In 1981, Congress extended the statute again, and—apparently in response to the charge that the distinction between credit-card surcharges and cash discounts remained difficult to understand—further clarified the matter by defining the term "regular price" as follows:

> the tag or posted price charged for the property or service if a single price is tagged or posted, or the price charged for the property or service when payment is made by use of [a credit card] if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment is made by use of [a credit card] and the other when payment is made by use of cash, check, or similar means.

---

[3] In the hearings leading up to the enactment of the 1976 Amendments, at least one congressman expressed disbelief that this clarification was needed, opining that the distinction between cash discounts and credit-card surcharges ought to be obvious. *See A Bill to Amend the Fair Credit Billing Act (Public Law 93-495) with Respect to the Use of Cash Discounts, and for Other Purposes: Hearing on H.R. 10209 before the Subcomm. on Consumer Affairs. of the H. Comm. on Banking, Currency, and Housing*, 94th Cong. 96 (1975) (Statement of Congressman Wylie) ("[T]o say that the word 'surcharge' and the word 'discount' are synonymous, makes us all look like fools in my judgment.").

Cash Discount Act § 102, Pub. L. No. 97-25, 95 Stat. 144 (1981)(codified in relevant part at 15 U.S.C. § 1602(y)).

The 1981 enactment provided that the ban on credit-card surcharges would expire on February 27, 1984. *Id.* § 201. The ban expired on that date, and Congress did not renew it. The federal ban's expiration motivated eleven states to enact their own laws prohibiting credit-card surcharges. New York was one of those states.

**C. Section 518's Enactment**

Section 518, in its entirety, reads as follows:

> No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means.

> Any seller who violates the provisions of this section shall be guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars or a term of imprisonment up to one year, or both.

N.Y. Gen. Bus. Law § 518.[4] Thus, Section 518's operative language is essentially identical to that of the lapsed federal surcharge ban, but it does not incorporate its federal counterpart's explicit definitions of "surcharge," "discount," and "regular price." 15 U.S.C. § 1602(q), (r), (y).

---

[4] A "seller" is defined as "any person who honors credit cards or debit cards which may be used to purchase or lease property or services." N.Y. Gen. Bus. Law § 511.6.

10

When the bill proposing Section 518 was introduced in the New York legislature, the bill summary indicated that the law was necessary to take the place of the lapsed federal surcharge ban. It cited the risk that merchants would, "at the time of the sale, raise or lower the price according to the method of payment," leaving the "consumer . . . subject to dubious marketing practices and variable purchase prices." It also clarified, however, that "merchant[s] would be able to offer a discount for cash if they so desire." J.A. 109.

Advocacy groups were divided on the proposed bill. It was supported by the New York State Consumer Protection Board, which explained that surcharges "psychologically . . . impose penalties on purchasers and may actually dampen retail sales," and also expressed the fear that permitting credit-card surcharges would undermine efforts to "insure that customers can depend on advertised claims and prices . . . by permitting unannounced price increases at the point of sale." J.A. 114. However, the Retail Council of New York State opposed the bill, arguing that swipe fees required merchants to increase their prices, and that in the absence of surcharges, price increases would be spread across all customers, resulting in cash purchasers' effectively subsidizing credit-card users' purchases. Ultimately, the

11

New York Senate passed Section 518 by a vote of fifty-two to seven, and the Assembly passed it unanimously.

**D. Section 518's Enforcement History**

Although New York's statutory ban on credit-card surcharges has been in effect for several decades, it was, for much of that time, effectively redundant with standard provisions in credit-card issuers' contracts that prohibited sellers from imposing credit-card surcharges on customers (although, as previously noted, TILA guarantees sellers' freedom to offer cash discounts).[5]  As a result, there are almost no reported cases involving Section 518's application.

The parties have cited just one reported prosecution under Section 518.  In 1986, Eugene Fulvio, a gas-station owner, was charged with an attempted violation of the statute.  Initially, a New York trial court rejected Fulvio's motion to dismiss on the ground that Section 518 was unconstitutionally vague on its face.  *See People v. Fulvio*, 514 N.Y.S.2d 594, 597 (Crim. Ct. 1987) ("*Fulvio I*") (holding that Section 518 by its terms "gave the defendant fair warning as to what conduct was prohibited").

---

[5] In the last decade, sellers began challenging these provisions in various antitrust lawsuits, which culminated in a nationwide class-action settlement pursuant to which Visa and MasterCard agreed to drop their contractual prohibitions on credit surcharges.  *See In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013) (approving this settlement).

After a subsequent bench trial, however, a different trial-court judge granted Fulvio's renewed motion to dismiss on the ground that Section 518 was void for vagueness as applied to him. *See People v. Fulvio*, 517 N.Y.S.2d 1008, 1015 (Crim. Ct. 1987) ("*Fulvio II*") (finding the law unconstitutional because "it is not the *act* which is outlawed, but the *word* given that act"). Despite distinguishing *Fulvio I* on the ground that it had involved a facial as opposed to an as-applied challenge, the court in *Fulvio II* did not actually resolve a factual dispute as to whether Fulvio had posted separate cash and credit-card prices at his gas station (as Fulvio had testified at trial), or instead posted a single price and then imposed a surcharge for credit-card use (as the complainant had testified). *See id.* at 1011–12.

In addition to the *Fulvio* prosecution, Plaintiffs point to another, more recent spate of enforcement activity involving Section 518. In 2009, the New York State Attorney General's office announced that it had reached settlements with fourteen heating-oil sellers in Suffolk County who had been violating Section 518. According to affidavits submitted by some of those sellers in this case, the sellers had communicated with their customers over the phone: the sellers "would tell [customers] the price of fuel (for example, $3.45/gallon) and then explain that there was a surcharge on top of that price for paying with a credit card (for example,

13

$.05/gallon)." J.A. 153. The Attorney General's office told the sellers that these communications were illegal under Section 518, but that the sellers "could quote the price as $3.50/gallon . . . and then explain to customers that they would receive a $.05/gallon 'discount' for paying with cash." J.A. 154.

**E. Procedural History**

Plaintiffs filed this action against New York in the Southern District of New York on June 4, 2013. Their July 15, 2013 amended complaint contains three claims (all brought pursuant to 42 U.S.C. § 1983), which allege, respectively, that Section 518 violates the First Amendment's free-speech guarantee, is void for vagueness under the Due Process Clause of the Fourteenth Amendment, and is preempted by the Sherman Antitrust Act. Plaintiffs sought a declaration that Section 518 is both unconstitutional and preempted, as well as an injunction against its enforcement.

In their amended complaint, Plaintiffs allege that they would like to charge credit-card customers more than cash customers to account for the credit-card companies' swipe fees. Specifically, they would like to impose a credit-card surcharge, as opposed to offering a cash discount. According to the amended complaint, only one Plaintiff currently charges different amounts for credit and cash purchases: Expressions Hair Design, a unisex hair salon in Vestal, New York, alleges

14

that its current policy is to charge two different prices, one for credit-card customers and one for cash customers. However, it claims to fear that describing this difference as a "surcharge," or "say[ing] that credit is 'extra' or 'more,'" might violate Section 518. J.A. 58.

On June 17, 2013, Plaintiffs moved for a preliminary injunction preventing Defendants from enforcing Section 518 against them, and New York moved to dismiss on ripeness and standing grounds, as well as for failure to state a claim. In supplemental affidavits submitted along with their motion, two Plaintiffs—Stephen Milles, the vice president of Five Points Academy, and Linda Fiacco, the co-owner of Expressions Hair Design—clarify the pricing schemes that they would like to use but which are (or may be) prohibited by Section 518. Milles avers that Five Points would like to impose "an extra charge, or 'surcharge,'" for credit-card users and to "display prominently the surcharge that the customer will incur." J.A. 149. According to Milles, "[i]t is not our intention to display two separate prices for each good and service that we offer, but rather to display—with roughly equal prominence—a single set of prices and the credit card surcharge amount." J.A. 149. Along similar lines, Fiacco avers that Expressions Hair Design would like to charge credit-card customers three percent more than cash customers, and to display a sign

15

that "characterize[s] the price difference as a 3% credit-card surcharge on top of the listed cash price" without "displaying the total credit-card price as a dollar figure." J.A. 151.

On October 3, 2013, the district court issued an opinion granting Plaintiffs' preliminary injunction motion and denying New York's motion to dismiss. *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430 (S.D.N.Y. 2013). The district court found that Plaintiffs' challenge was ripe because they were presently chilled from implementing their preferred pricing scheme, and that Plaintiffs had standing based on a credible fear that Section 518 would be enforced against them. As for the First Amendment, the district court concluded that Section 518 burdens speech by "draw[ing] the line between prohibited 'surcharges' and permissible 'discounts' based on words and labels, rather than economic realities." *Id.* at 444. Applying the *Central Hudson* test for non-disclosure restrictions on commercial speech, the district court found Section 518 unconstitutional. *See id.* at 447. The district court also held that Section 518 was void for vagueness because it "turns on the labels that sellers use to describe their prices." *Id.* at 448. The court further held that Plaintiffs had demonstrated the other elements necessary for a preliminary injunction, and therefore "preliminarily enjoin[ed] the defendants from enforcing

16

section 518 . . . during the pendency of this case." *Id.* at 450. (The district court also denied New York's motion to dismiss Plaintiffs' preemption claim, though Plaintiffs had not sought a preliminary injunction on that ground.)

The parties stipulated to—and the district court entered, on November 4, 2013—a final judgment on Plaintiffs' First and Fourteenth Amendment claims, even though their preemption claim was still pending. *See* Fed. R. Civ. P. 54(b) ("[T]he court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."). In the final judgment, the district court (1) "declare[d] that [Section 518] violates the First Amendment and is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment," (2) "permanently enjoin[ed] the defendants from enforcing [Section 518] against the plaintiffs," and (3) dismissed Plaintiffs' preemption claim as moot, without prejudice. J.A. 213.

This appeal followed.

## DISCUSSION

"When reviewing an order granting either a preliminary or a permanent injunction, we review the district court's legal holdings de novo and its ultimate decision for abuse of discretion." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin.*

*Auth.*, 764 F.3d 210, 214 (2d Cir. 2014). Because we conclude that the district court erred in holding that Section 518 violates the First Amendment and the Due Process Clause, we vacate the judgment entered below and remand for dismissal. We begin with the First Amendment.

**I.**

**A.**

Some preliminary discussion is necessary to frame more precisely the scope of Plaintiffs' First Amendment challenge. Again, the statute provides that "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." N.Y. Gen. Bus. Law § 518. Because the statute does not define the word "surcharge," we give it its ordinary meaning. *See FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011). A "surcharge" ordinarily means "a charge in excess of the usual or normal amount: an additional tax, cost, or impost." *Webster's Third New International Dictionary* 2299 (2002); *see also Black's Law Dictionary* 1579 (9th ed. 2009) (defining "surcharge" as "[a]n additional tax, charge, or cost"); *Duprey v. State of Conn., Dep't of Motor Vehicles*, 28 F. Supp. 2d 702, 707 (D. Conn. 1998) (explaining that "a fee is a surcharge if it is in excess of a usual or normal amount"). Accordingly, Section 518's use of the word "surcharge"

18

assumes that a seller to which the statute applies will have a "usual or normal" price that serves as a baseline for determining whether credit-card customers are charged an "additional" amount that cash customers are not.

The parties agree that this baseline is not the ultimate price that the seller charges to cash customers, but rather is something different—namely, the seller's "regular" price. Importantly, then, Section 518 does not prohibit all differentials between the price ultimately charged to cash customers and the price ultimately charged to credit-card customers; it forbids charging credit-card customers an additional amount *above* the regular price that is not also charged to cash customers, but it permits offering cash customers a discount *below* the regular price that is not also offered to credit-card customers. (That is, it allows what we have termed "cash discounts.") To illustrate, if a seller's regular price is $100, it may not charge credit-card customers $103 and cash customers $100, but if the seller's regular price is $103, it *may* charge credit-card customers $103 and cash customers $100. This distinction is consistent with the federal surcharge ban on which Section 518 was modeled, which (1) defined "surcharge" as "any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash," (2) defined

19

"discount" as "a reduction made from the regular price," and (3) clarified that a discount "shall not mean a surcharge." 15 U.S.C. § 1602(q), (r).

If a surcharge means an additional amount above the seller's regular price, then it is basically self-evident how Section 518 applies to sellers who post single, readily ascertainable prices for their goods or services (or what we will call "sticker prices"): the sticker price is the "regular" price, so sellers may not charge credit-card customers an additional amount above the sticker price that is not also charged to cash customers. As Plaintiffs point out, however, not all sellers post single sticker prices for their goods or services. The federal surcharge ban was eventually revised to account for this possibility by defining the term "regular price" so that the statute could never be violated unless the seller "tagged or posted" a single price. *See* 15 U.S.C. § 1602(y) (defining "regular price," in relevant part, as "the price charged . . . when payment is made by [credit card] if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment is made by [credit card] and the other when payment is made by use of cash, check, or similar means"). Section 518, by contrast, does not explicitly use the term "regular price," much less define it, nor does the law otherwise indicate whether or how it applies outside the single-sticker-price context. This difference between Section 518

20

and the lapsed federal surcharge ban raises certain questions about the former law's scope: Can a seller have a "regular" price if it does not post a single sticker price? If so, what is it?

With this background in mind, we turn to Plaintiffs' challenge to Section 518. Plaintiffs' submissions reveal that they are claiming First Amendment protection for two distinct kinds of pricing schemes. First, Plaintiffs aver that they would like to post only a single price for their goods and services and charge more than that price to credit-card customers, but are prohibited from doing so by Section 518. *See, e.g.,* J.A. 149 (Five Points Academy: "It is not our intention to display two separate prices for each good and service that we offer, but rather to display—with roughly equal prominence—a single set of prices and the credit card surcharge amount."); J.A. 151 (Expressions Hair Design: "We would like to . . . characterize the price difference as a 3% credit-card surcharge on top of the listed cash price."). In other words, Plaintiffs are seeking First Amendment protection for the kind of straightforward single-sticker-price scheme that Section 518 clearly prohibits. Second, Expressions Hair Design (the only Plaintiff to do so) currently posts two different prices for its services—one for credit-card customers and one for cash customers—and fears being prosecuted for characterizing this price differential as a "surcharge," or for

21

telling its customers that credit costs "more." J.A. 56–58. (We will refer to this second pricing scheme as a "dual-price" scheme.)

Throughout the course of this litigation, Plaintiffs have attempted to demonstrate Section 518's unconstitutionality by reference to other, hypothetical pricing schemes that they neither currently employ at their businesses nor claim they would employ but for Section 518. Assessing a statute's constitutionality as applied to hypothetical situations not before the court, however, is appropriate only if the challenger is mounting a facial attack on the statute. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (explaining that "[f]acial challenges are disfavored" in part because they "run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied'" (quoting *Ashwander v. TVA*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring))). Two kinds of facial challenges are generally available in the First Amendment context**:** a plaintiff can attempt to demonstrate either (1) "that the law is unconstitutional in all of its applications," or (2) that "a 'substantial number' of its applications are unconstitutional 'judged in relation to the statute's plainly

22

legitimate sweep.'" *Id.* at 449 & n.6 (quoting *New York v. Ferber*, 458 U.S. 747, 769–71 (1982)). *But see Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481 (1989) (noting that overbreadth challenges are normally not available in the context of commercial speech). In either case, where (as here) the plaintiff delineates the specific conduct for which it is claiming protection, assessing the challenged statute's constitutionality as applied to that conduct is a critical first step. If that analysis shows that the plaintiff's own conduct may lawfully be prohibited, then the statute is not "unconstitutional in all of its applications." Even in an overbreadth challenge, moreover, the Supreme Court has told courts not to consider whether a statute is substantially overbroad "before it is determined that the statute would be valid as applied." *Fox*, 492 U.S. at 484–85.

Plaintiffs do not clarify in their briefing whether they are, in fact, mounting a facial attack on Section 518.[6] At oral argument, they suggested that their challenge

---

[6] In discussing facial and as-applied challenges, we recognize that these categories are simply useful analytical tools, as opposed to necessary elements of a plaintiff's claim. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). In all cases, a federal court is limited to determining the rights and obligations of the parties before it; whether a law is invalidated "on its face" or merely "as applied" therefore depends on whether or not the reasoning used to invalidate the law in the particular case before the court would apply equally in any challenge to the same law. *See City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457–58 (2015) (Scalia, J., dissenting); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1339–40 (2000). In this case, we think the distinctions between facial and as-applied challenges are quite important analytically for the reasons given in the text.

23

is exclusively as-applied, but that characterization is in significant tension with their general failure to focus narrowly on the actual conduct in which they are engaged or would like to be engaged. Ultimately, however, any uncertainty regarding the scope of Plaintiffs' First Amendment challenge does not meaningfully affect our analysis. For the reasons set forth below, we conclude that Section 518 does not violate the First Amendment as applied to single-sticker-price sellers. We further conclude that any challenge premised on Section 518's application outside the single-sticker-price context (whether facial or as-applied) necessarily fails because Section 518 is "readily susceptible" to a construction under which its application is limited to that context. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988). The district court therefore erred in holding that Section 518 violates the First Amendment.

**B.**

As applied to single-sticker-price schemes like the ones described in Plaintiffs' submissions, Section 518 does not violate the First Amendment. Restrictions on commercial speech are traditionally analyzed under the four-factor test established in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980). Plaintiffs argue, and the district court held, that Section 518

burdens commercial speech and does not survive *Central Hudson*. *See Expressions Hair Design*, 975 F. Supp. 2d at 444, 447. On appeal, New York argues that Section 518 regulates conduct, not speech; in the alternative, it maintains that the law survives *Central Hudson*.[7] Because we agree with New York that Section 518 does not regulate speech as applied to single-sticker-price sellers, we do not reach the parties' arguments under *Central Hudson*.

We start from the premise—conceded by Plaintiffs—that prices, although necessarily communicated through language, do not rank as "speech" within the meaning of the First Amendment. This principle is illustrated most vividly by the fact that price-control laws, which necessarily prevent sellers from communicating certain (illegal) prices, have never been thought to implicate the First Amendment. *See, e.g., Munn v. Illinois*, 94 U.S. (4 Otto) 113, 125 (1876) ("[It] has been customary . . . in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, &c., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished,

---

[7] New York argues further that if we conclude that Section 518 does not regulate speech, we could uphold it under the test applicable to restrictions on expressive conduct. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968). As explained in the text, we agree that Section 518 does not regulate speech, but because Plaintiffs have not argued that the law fails *O'Brien* scrutiny, we do not consider that possibility.

and articles sold."). Accordingly, although the Supreme Court has now repeatedly held that the advertising of *lawful* prices is protected by the First Amendment, *see, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504–08 (1996) (plurality opinion); *Va. State Bd. of Pharmacy v. Va. Citizens' Consumer Council, Inc.*, 425 U.S. 748, 761–70 (1976), it has reaffirmed in doing so that states may continue to make certain prices *un*lawful through "direct regulation," *44 Liquormart*, 517 U.S. at 507 (plurality opinion); *accord id.* at 524 (Thomas, J., concurring in part and concurring in the judgment); *id.* at 530 (O'Connor, J., concurring in the judgment); *see Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71, 77 (1st Cir. 2013) ("In *44 Liquormart, Inc. v. Rhode Island*, a majority of the Justices, in striking down the categorical ban on liquor price advertising there, made clear that price regulations and other forms of direct economic regulation do not implicate First Amendment concerns." (citation omitted)).

If prohibiting certain prices does not implicate the First Amendment, it follows that prohibiting certain relationships between prices also does not implicate the First Amendment. Indeed, Plaintiffs readily concede that New York could simply prohibit sellers from charging different amounts for credit-card and cash purchases altogether without thereby "trigger[ing] First Amendment scrutiny."

26

Appellees' Br. at 36. The problem with Section 518, in Plaintiffs' view, lies in the undisputed fact that the statute forbids credit-card surcharges while simultaneously permitting cash discounts. Because both credit-card surcharges and cash discounts ultimately amount to equivalent differences between the price charged to credit-card customers and the price charged to cash customers, Plaintiffs argue that (in the district court's words) Section 518 burdens protected expression by "draw[ing] the line between prohibited 'surcharges' and permissible 'discounts' based on words and labels, rather than economic realities." *Expressions Hair Design*, 975 F. Supp. 2d at 444. We disagree.

By its terms, Section 518 does not prohibit sellers from referring to credit-cash price differentials as credit-card surcharges, or from engaging in advocacy related to credit-card surcharges; it simply prohibits imposing credit-card surcharges. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 60 (2006) (explaining that a statute regulates "conduct, not speech," when it affects what regulated entities "must *do*," not "what they may or may not *say*"). Whether a seller is imposing a credit-card surcharge—in other words, whether it is doing what the statute, by its plain terms, prohibits—can be determined wholly without reference to the words that the seller uses to describe its pricing scheme. If the seller is

27

charging credit-card customers an additional amount above its sticker price that it is not charging to cash customers, then the seller is imposing a forbidden credit-card surcharge. The only "words and labels" on which the operation of the statute thus depends are (1) the seller's sticker price and (2) the price the seller charges to credit-card customers. But these two "words and labels" are merely prices. And, as we have explained and as Plaintiffs themselves recognize, prices (though necessarily communicated through language) are not "speech" within the meaning of the First Amendment, nor are they transformed into "speech" when considered in relation to one another. Because all that Section 518 prohibits is a specific relationship between two prices, it does not regulate speech.

Plaintiffs' chief error—or, perhaps more accurately, the central flaw in their argument—is their bewildering persistence in equating the actual imposition of a credit-card surcharge (i.e., a seller's choice to charge an additional amount above the sticker price to its credit-card customers) with the words that speakers of English have chosen to describe that pricing scheme (i.e., the term "credit-card surcharge"). This is the only way to make sense of Plaintiffs' argument that "[w]hat [Section 518] regulates—all that it regulates—is what merchants may say: Characterizing the price difference as a cash 'discount' is favored; characterizing it as a credit 'surcharge' is

28

a crime." Appellees' Br. at 27. But Plaintiffs are simply wrong. What Section 518 regulates—all that it regulates—is the difference between a seller's sticker price and the ultimate price that it charges to credit-card customers. A seller imposing a surcharge (an additional amount above its sticker price) on credit-card customers could choose to "characterize" that additional charge as whatever it wants, but that would not change the fact that it would be violating Section 518. Conversely, a seller offering a discount (a reduction from its sticker price) to cash customers could choose to "characterize" that reduction as whatever it wants (including as a "credit-card surcharge"), but that would not change the fact that the seller would *not* be violating Section 518. Of course, it is more likely that if a seller is imposing a credit-card surcharge, it will refer to its pricing scheme by its ordinary label—"credit-card surcharge"—while a seller offering a cash discount is likely to refer to its pricing scheme as a "cash discount." But the fact that these pricing schemes *have* different labels (and thus that sellers are likely to refer to them using different words) obviously does not mean that *all they are* is labels.

In Plaintiffs' view, credit-card surcharges and cash discounts must just be labels because consumers react differently to them: they react more negatively to credit-card surcharges than they react to cash discounts. Thus, Plaintiffs argue, New

29

York has violated the First Amendment by banning a label it disfavors ("credit-card surcharge") while permitting a label it approves ("cash discount").  This argument, however, plainly begs the question: it assumes (incorrectly) that what New York has regulated are, in fact, labels.  It is true, of course, that the government generally may not enact speech restrictions favoring one message over another.  *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.").  But that well-established First Amendment principle is of no relevance whatsoever with respect to the threshold question whether the restriction at issue regulates speech or, instead, conduct.[8]  In other words, as New York astutely observes, "[s]peech is not the only cause of consumer unhappiness; the mere fact that consumers react negatively to surcharges thus does not prove that surcharges are speech."  Appellants' Reply Br. at 15.

In fact, consumers react negatively to credit-card surcharges not because surcharges "communicate" any particular "message," but because consumers dislike

---

[8] Plaintiffs' argument that Section 518 is "speaker-based," because it applies only to "sellers," is similarly circular.  *See Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2663 (2011) (applying heightened First Amendment scrutiny to statute that "burdens disfavored *speech* by disfavored *speakers*") (emphasis added).

being charged extra. *See* Kahneman et al., *supra*, at 199 ("[C]hanges that make things worse (losses) loom larger than improvements or gains."). If a consumer thinks, based on a seller's sticker price, that she will be paying $100 for the seller's goods or services, then she will be annoyed if it turns out that she actually has to pay $103 simply because she has chosen to use a credit card; by contrast, if the sticker price is $103, she will be less annoyed by having to pay $103, even if cash customers only have to pay $100. Nothing about the consumer's reaction in either situation turns on any words uttered by the seller. And although the difference in the consumer's reaction to the two pricing schemes may be puzzling purely as an economic matter, we are aware of no authority suggesting that the First Amendment prevents states from protecting consumers against irrational psychological annoyances.

Although the First Amendment generally prevents the government from justifying a *speech* restriction by reference to the harmful reactions that the speech in question will cause among the reading or listening public, *see, e.g.*, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) ("We have . . . rejected the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information."), there is nothing controversial about the government's

31

banning certain *prices* because of how consumers will react to them. The Supreme Court has said, for example, that states may enact price-control laws for the express purpose of suppressing consumer demand. *See 44 Liquormart*, 517 U.S. at 507 (plurality opinion) ("It is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal of promoting temperance. . . . [H]igher prices can be maintained either by direct regulation or by increased taxation."). Accordingly, in *National Association of Tobacco Outlets v. City of Providence*, the First Circuit held that the City of Providence, Rhode Island could, consistent with the First Amendment, prohibit discounts for tobacco products based on evidence that such discounts would lead "to higher rates of tobacco use among young people." 731 F.3d at 76 (quoting U.S. Dep't of Health & Human Servs., *Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General* 527–29 (2012)). Similarly, here, New York enacted Section 518 in part to prevent negative consumer reactions to credit-card surcharges—in effect, spurring demand for credit-card use, instead of suppressing it. The First Amendment poses no obstacle to such a law.[9]

---

[9] The subtext of Plaintiffs' argument that it is impermissible to regulate based on consumer reactions is their view that Section 518 was passed at the behest of the credit-card lobby to encourage consumers to use credit cards as opposed to cash. Even assuming that credit-card companies favored the law for that reason, however, the New York legislature

32

Plaintiffs' argument that Section 518 regulates how sellers "communicate" with their customers might also be understood as an argument that Section 518 regulates speech merely by forbidding sellers from setting their sticker prices lower than the prices that they ultimately charge to credit-card customers—in other words, that where a seller chooses to set its sticker price is a communicative act. Thus, if a seller wants to charge credit-card customers $103 and cash customers $100 in order to pass along the credit-card companies' swipe fees, the seller could (if Section 518 were no obstacle) either set its sticker price at $100 and thereby "communicate" a credit-card surcharge or, presumably just as easily, set its sticker price at $103 and thereby "communicate" a cash discount. This variation on Plaintiffs' argument, however, amounts to the position—which we have already rejected and which Plaintiffs concede is incorrect—that prices are themselves speech. The fact that sellers can move their sticker prices up and down with relative ease (and thus that sticker prices are, at least in some sense, not dictated by "economic realities") does

identified a number of public-regarding rationales for the law's enactment. Moreover, a panel of this Court has recently expressed the view (that we need not address) that even unadulterated "economic favoritism" is a sufficiently rational basis to justify a state law regulating economic activity. *Sensational Smiles, LLC v. Mullen*, --- F.3d ----, 2015 WL 4385295, at *3 (2d Cir. July 17, 2015). Yet more pertinently here, Plaintiffs do not raise a rational-basis challenge to Section 518. Regardless of *why* New York wanted to prevent consumers from reacting negatively to credit-card surcharges, the *First Amendment* does not prohibit regulating on that basis where the object of the regulation is conduct, not speech. The wisdom of the policy choices animating Section 518 is not for us to judge.

33

not alter the fact that sticker prices, like any other prices, can be regulated without bringing the First Amendment into play.

In concluding that sticker prices are not constitutionally exceptional, we again draw support from the First Circuit's decision in *National Association of Tobacco Outlets*, which is both closely on-point and persuasive. There, the First Circuit rejected a First Amendment challenge to an ordinance that (among other things) barred retailers from using coupons "that provide[] any tobacco products without charge or for less than the listed or non-discounted price," and from selling tobacco products "through . . . multi-pack discounts." 731 F.3d at 74. The plaintiffs argued that offering discounts to their customers was an inherently communicative act, but the First Circuit disagreed, reasoning that the ordinance did not "restrict[] retailers or anyone else from communicating pricing information concerning the lawful sale price of cigarettes," but rather "restrict[ed] the ability of retailers to engage in certain pricing practices." *Id.* at 77; *see also Nat'l Ass'n of Tobacco Outlets v. City of New York*, 27 F. Supp. 3d 415, 421–22 (S.D.N.Y. 2014) (relying on the First Circuit's decision to uphold a New York City law banning "the sale of cigarettes and tobacco products below the listed price"). Thus, the fact that the tobacco sellers readily could have lowered their "listed or non-discounted price" to the discounted price—thereby

34

resulting in their customers ultimately paying the exact same amount for tobacco products—did not affect the fact that the ordinance regulated a pricing practice, not speech. Here, too, the fact that a seller can simply raise its sticker price to the credit-card price—thereby resulting in its credit-card customers ultimately paying the exact same amount as they would have if the seller had set a lower sticker price and imposed a credit-card surcharge—does not affect the fact that Section 518 regulates a pricing practice, not speech.[10]

In short, Plaintiffs have provided no reason for us to conclude that Section 518, which regulates the relationship between a seller's sticker price and its credit-card price, differs in a constitutionally significant way from other laws that regulate prices and therefore do not implicate the First Amendment. As applied to single-sticker-price schemes like the ones described in Plaintiffs' submissions, Section 518 regulates conduct, not speech.[11]

---

[10] Along similar lines, Plaintiffs appear to concede that laws against price-gouging—which regulate the difference between the seller's regular price and the price that may be charged in periods of unusually high demand, *e.g.*, N.Y. Gen. Bus. Law § 396-r—do not implicate the First Amendment. We do not see how a seller's normal price for the purpose of anti-price-gouging laws is meaningfully different from its sticker price for the purpose of Section 518.

[11] At least two district courts have previously reached this same conclusion with respect to other states' credit-card surcharge bans. *See Rowell v. Pettijohn*, No. 14-cv-190, slip op. at 6 (W.D. Tex. Feb. 4, 2015) ("[T]he Texas Anti-Surcharge law regulates only prices charged, an economic activity that is within the state's police power, and does not implicate

35

We note that under *United States v. O'Brien*, 391 U.S. 367 (1968), laws that exclusively regulate conduct (as Section 518 does) may nonetheless implicate the First Amendment in cases where the conduct at issue is "inherently expressive." *Forum for Acad. & Institutional Rights*, 547 U.S. at 66. Plaintiffs, however, adhering steadfastly to their argument that Section 518 regulates speech, have not asked us to assess Section 518's constitutionality under the Supreme Court's expressive-conduct precedents. *See* Appellees' Br. at 38 n.4 ("Because the no-surcharge law regulates only speech, *United States v. O'Brien* is irrelevant."). We therefore decline to consider any such challenge.

## C.

We now turn to the balance of Plaintiffs' First Amendment challenge, which is premised on the assumption that Section 518 applies to sellers who do not post single sticker prices. Because this portion of Plaintiffs' challenge turns on an unsettled question of state law, we do not reach the merits. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941); *see also Nicholson v. Scoppetta*, 344 F.3d 154, 168 (2d

---

the First Amendment."); *Dana's Railroad Supply v. Bondi*, No. 14-cv-134, slip op. at 5 (N.D. Fla. Sept. 2, 2014) (holding that Florida's anti-surcharge law is a "[r]estriction on pricing" and thus not subject to First Amendment scrutiny). *But see Italian Colors Rest. v. Harris*, No. 14-cv-604, 2015 WL 1405507, at *5–6 (E.D. Cal. Mar. 26, 2015) (holding that California's anti-surcharge law burdened protected speech and violated the First Amendment), *appeal docketed*, No. 15-15873 (9th Cir. filed Apr. 30, 2015).

Cir. 2003) ("[W]e have an independent obligation to consider whether *Pullman* abstention is appropriate.").

Two sets of arguments relevant here turn on the question whether Section 518 applies outside the single-sticker-price context (and, if so, to what extent). First, Plaintiffs argue that Section 518 violates the First Amendment as applied to Expressions Hair Design's "dual-price" scheme. Under its scheme, Expressions Hair Design "charge[s] two different prices for haircuts and other services—a lower price for customers paying with cash, check, or debit card and a higher price for customers paying with a credit card." J.A. 57. Expressions Hair Design allegedly fears that it will be prosecuted under Section 518 simply for "characterizing that price difference as a 'surcharge' or an 'extra' charge for paying with a credit card, even though its customers *do* effectively pay more for using a credit card." J.A. 57; *see also* J.A. 58.

Second, Plaintiffs posit a number of hypothetical pricing schemes that they do not actually employ (or profess any desire to employ), but which, Plaintiffs nonetheless suggest, deserve First Amendment protection. To take some specific examples that have been discussed over the course of this litigation: A seller might not post any prices at all, but ultimately charge credit-card customers more than

37

cash customers to pass along the cost of the credit-card companies' swipe fees. Or the seller might post two sets of prices—one for credit and one for cash—but display the cash price more prominently to its customers. Or the seller might "advertise[] two prices with equal prominence: '$100 per widget' and '$103 per widget with 3% credit-card surcharge.'" *Expressions Hair Design*, 975 F. Supp. 2d at 443. Or it might attempt to comply with Section 518 by posting a single sticker price and then offering a cash discount, only to have its employees persistently tell customers that the discounted cash price is actually the "regular" price, and that using a credit-card costs "more," or "extra." Other possibilities surely abound. In any event, because Plaintiffs' submissions in this case do not suggest that they will ever be engaged in this hypothetical conduct, we assume, *arguendo*, that their references to such conduct amount to a facial attack on Section 518. Of course, our conclusion that Section 518 is constitutional as applied to single-sticker-price sellers means that the statute is not unconstitutional in "all of its applications," so the only kind of facial challenge that remains available to Plaintiffs is an overbreadth challenge. *Wash. State Grange*, 552 U.S. at 449.

Both our precedent and Supreme Court precedent squarely hold that overbreadth challenges predicated on the chilling of commercial speech are not

38

available under the First Amendment**.** *See Allstate Ins. Co. v. Serio*, 261 F.3d 143, 153 n.16 (2d Cir.), *certified question accepted*, 96 N.Y.2d 931 (2001), and *certified question answered*, 98 N.Y.2d 198 (2002); *see also Fox*, 492 U.S. at 481 ("Although it is true that overbreadth analysis does not normally apply to commercial speech, that means only that a statute whose overbreadth consists of unlawful restriction of commercial speech will not be facially invalidated on that ground—our reasoning being that commercial speech is more hardy, less likely to be 'chilled,' and not in need of surrogate litigators." (citations omitted)). But as several commentators have pointed out, in the years since *Fox*, commercial speech doctrine has undergone substantial changes. *See* Micah L. Berman, *Manipulative Marketing and the First Amendment*, 103 Geo. L. J. 497, 509-13 (2015) (observing that Supreme Court precedent since *Central Hudson* has appeared to take a progressively stricter approach to regulations of commercial speech); Troy L. Booher, *Scrutinizing Commercial Speech*, 15 Geo. Mason U. Civ. Rts. L.J. 69 (2004) (arguing that Supreme Court precedent in the years since *Fox* has gradually eroded the distinction between commercial and non-commercial speech, and thus undermined doctrinal differences predicated on that distinction). Our precedent remains clear that no such challenge is available here. Nevertheless, in an abundance of caution we assume, *arguendo*, the availability of such a challenge,

and demonstrate that such availability would not alter the outcome of our decision. Indeed, the Supreme Court has taken just this approach before. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462 n.20 (1978).

The First Amendment overbreadth doctrine "permits a defendant to make a facial challenge to an overly broad statute restricting speech, even if he himself has engaged in speech that could be regulated under a more narrowly drawn statute." *Alexander v. United States*, 509 U.S. 544, 555 (1993). This doctrine responds to the concern that "the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). However, because there are "obvious harmful effects" to facially invalidating a law "that in some of its applications is perfectly constitutional," courts "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008); *see, e.g., United States v. Farhane*, 634 F.3d 127, 136–37 (2d Cir. 2011); *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335–36 (6th Cir. 2009) (en banc).

The primary problem with both Plaintiffs' as-applied challenge and their putative overbreadth challenge is that it is far from clear that Section 518 prohibits the relevant conduct in the first place. As noted earlier, the federal statute on which Section 518 was modeled was eventually revised to clarify that it did not, in fact, apply to sellers that did not post single sticker prices: it defined "regular price" as "the tag or posted price . . . if a single price is tagged or posted, or the price . . . when payment is made by use of [a credit card] if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment is made by use of [a credit card] and the other when payment is made by use of cash, check, or similar means."  15 U.S.C. § 1602(y).  Plaintiffs' argument that Section 518 extends outside the single-sticker-price context therefore depends on the assumption that Section 518 has a broader reach than the federal statute did.  The parties, however, have not cited a single decision by a New York appellate court interpreting the scope of Section 518's prohibition.  As we will explain, that dearth of authority dooms both of Plaintiffs' remaining challenges.

"When anticipatory relief is sought in federal court against a state statute, respect for the place of the States in our federal system calls for close consideration" of whether a ruling on the constitutionality of the state law is, in fact, necessary.

41

*Arizonans for Official English v. Arizona*, 520 U.S. 43, 75 (1997). In particular, a well-established body of law—overlooked almost entirely by the parties and the district court in this case—exists to avoid the "friction-generating error" that can result when a federal court "endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Id.* at 79; *see Allstate Ins. Co.*, 261 F.3d at 150 ("Where a decision is to be made on the basis of state law, . . . the Supreme Court has long shown a strong preference that the controlling interpretation of the relevant statute be given by state, rather than federal, courts."). The pathmarking precedent is *Pullman*, in which the Supreme Court held that federal courts should "abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 384 (2d Cir. 2000) (quoting *All. of Am. Insurers v. Cuomo*, 854 F.2d 591, 601 (2d Cir. 1988)); *see Pullman*, 312 U.S. at 500–01. After the federal court abstains, the parties may seek a controlling interpretation of the challenged law from the state courts, whose decision could cause the federal constitutional question to disappear altogether. Accordingly, *Pullman* abstention allows federal courts to avoid both "(a) premature decisions on questions of federal constitutional law, and (b) erroneous rulings with respect to state law." *Serio*, 261 F.3d at 150.

The Supreme Court has long relied on the principles animating *Pullman* in the context of First Amendment overbreadth challenges. As noted, an overbreadth challenge cannot succeed unless the challenged statute's application to protected speech is "substantial" in comparison to its legitimate sweep. Not infrequently, the substantiality vel non of a statute's overbreadth will not be self-evident, and will instead depend on how the statute is interpreted. If a state statute is susceptible of multiple interpretations, one of which might render it overbroad and another of which would not, *Pullman*'s logic suggests that the state courts—if they have not definitively construed the statute already—should be afforded the opportunity to adopt the narrower, less problematic interpretation. *See Tunick v. Safir*, 209 F.3d 67, 75–76 (2d Cir. 2000) (opinion of Calabresi, J.) (noting that state courts typically apply some version of the rule that a statute should be interpreted, if possible, so as to avoid constitutional doubts). Thus, in *Dombrowski v. Pfister*, the Supreme Court indicated that a state statute with a potentially "overbroad sweep" should not be invalidated in its entirety if a "readily apparent construction suggests itself" under which the state courts could eliminate any constitutional difficulty. 380 U.S. 479, 486, 491 (1965). The Court relied for this proposition on its earlier statement in *Baggett v. Bullitt*—a *Pullman* abstention case—that abstention is appropriate if the

43

challenged state law is susceptible to an interpretation that, if adopted by the state courts, "would eliminate the constitutional issue and terminate the litigation." 377 U.S. 360, 377 (1964); *see Dombrowski*, 380 U.S. at 491; *see also* Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 287 (1994) ("[W]hen a federal court upholds a state statute against a facial challenge on the basis that the statute could be construed to avoid constitutional infirmities, the court, in effect, abstains from rendering a decision of state law pursuant to *Pullman*."); Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 901–02 (1991) (similar).

The First Amendment principle recognized in *Dombrowski*—that a state law should not be struck down as substantially overbroad if a "readily apparent" narrowing construction is available—is not always explicitly acknowledged as an outgrowth of *Pullman* abstention. Nonetheless, federal courts have consistently reaffirmed that in considering an overbreadth challenge to a state statute, we must presume that the state courts will give the law a narrow construction so long as the law is "readily susceptible" to that construction. *Vt. Right to Life Comm.*, 221 F.3d at 386 (quoting *Am. Booksellers Ass'n*, 484 U.S. at 397); *see also, e.g., Ferber*, 458 U.S. at 773 (rejecting an overbreadth challenge premised on the "assum[ption] that the New York courts will widen the possibly invalid reach of the statute by giving an

44

expansive construction to [its] proscription"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts, and its deterrent effect on legitimate expression is both real and substantial.") (citation omitted); *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute."); Dorf, *supra*, at 287 ("[W]hen the validity of a statutory provision turns on its applicability to persons not before the court, the court need not presume that a state court would construe the statute in an unconstitutional manner as applied to those persons."). This presumption in favor of state laws' constitutionality is consistent, moreover, with the Supreme Court's emphasis on "[e]xercising judicial restraint in . . . facial challenge[s]" in order to avoid "premature interpretations of statutes in areas where their constitutional application might be cloudy." *Wash. State Grange*, 552 U.S. at 450 (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).

Applying the foregoing principles to the case at hand, we conclude that neither portion of Plaintiffs' First Amendment challenge premised on Section 518's application outside the single-sticker-price context can succeed. In light of the fact that Section 518's enactment was driven by the expiration of the federal surcharge

45

ban, it is entirely possible, if not likely, that New York courts would construe Section 518 as being identical to the lapsed federal ban. Certainly, we see nothing in Section 518's text that would foreclose such an interpretation: although the law lacks the federal statute's explicit definitions, the word "surcharge" itself, which means an additional amount above the seller's regular or usual price, may necessarily signal that the law simply does not apply in the absence of a single sticker price. *See Fulvio I*, 514 N.Y.S.2d at 596 ("While the term 'surcharge' is not precisely defined by the statute itself it retains its everyday, commonsense meaning . . . .") (footnote omitted). New York courts, moreover, like most state and federal courts around the country, will generally interpret statutes so as to avoid constitutional difficulties.[12] *See All. of Am. Insurers v. Chu*, 571 N.E.2d 672, 678 (N.Y. 1991); *Tunick*, 209 F.3d at 76 (opinion of Calabresi, J.).

---

[12] To be clear, we do not intend to suggest that the First Amendment would, in fact, be violated even if Section 518 were held to have a broader reach than the lapsed federal surcharge ban. For the reasons given in the text, we do not address that question in this opinion. However, to frame the constitutional question that might arise, we note that "[i]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Whether Section 518 violates the First Amendment outside the single-sticker-price context would therefore appear to turn on whether its application would properly be viewed as involving the seller's speech itself or, instead, underlying conduct that happens to be evidenced by speech. *Cf., e.g.*, *United States v. Caronia*, 703 F.3d 149, 160–63 (2d Cir. 2012).

46

We therefore conclude that Section 518 is "readily susceptible," *Vt. Right to Life Comm.*, 221 F.3d at 386, to a narrowing construction that "would eliminate the constitutional issue and terminate [this] litigation," *Baggett*, 377 U.S. at 377. As a result, we cannot presume that Section 518 has any applications outside the single-sticker-price context at all—that is, any applications other than the ones we have already found to be constitutional. To put this point more emphatically, we cannot hold a duly enacted state law unconstitutional based entirely on speculation that the New York courts might give it an expansive and arguably problematic reading that its text does not require. This holding both defeats Plaintiffs' putative overbreadth challenge and (on the other side of the same coin) calls for abstention with respect to Plaintiffs' as-applied challenge. In other words, the fact that Section 518 is readily susceptible to the narrowing construction that New York has identified means that Plaintiffs' putative overbreadth challenge fails, because we must presume as a matter of law that New York state courts would adopt such a construction; and the fact that the New York courts have not yet addressed this interpretive question means that we must abstain from deciding Plaintiffs' as-applied challenge.

The district court suggested that the actions of the New York prosecutors described above, by demonstrating that Section 518 has been enforced in accordance

47

with a broad interpretation, were "fatal" to New York's argument that Section 518 could be interpreted consistently with the lapsed federal ban. *Expressions Hair Design*, 975 F. Supp. 2d at 444. This was clear error. One reported prosecution and one set of threatened prosecutions by the state's executive branch shed little light, if any, on how the New York Court of Appeals would construe Section 518; the state prosecutors could easily have been mistaken as to the law's true breadth. *See Stenberg v. Carhart*, 530 U.S. 914, 941 (2000) ("[W]e have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference." (alteration in original) (quoting *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment))); *Arizonans for Official English*, 520 U.S. at 79 (noting the risk of federal courts' premising their constitutional rulings on interpretations of state statutes "not yet reviewed by the *State's highest court*" (emphasis added)). While the non-judicial precedents cited by the district court— as well as the linguistic differences between the texts—make it arguable that New York courts *could* interpret the law to have a broader reach than the federal

48

predecessor statute,[13] we decline to speculate as to which reading the state courts will adopt.

We also decline to certify to the New York Court of Appeals the question whether Section 518 applies to Expressions Hair Design's dual-price scheme.[14] We recognize that "[c]ertification today covers territory once dominated by . . . 'Pullman abstention.'" *Arizonans for Official English*, 520 U.S. at 75. Whereas *Pullman* abstention "entail[s] a full round of litigation in the state court system before any resumption of proceedings in federal court," certification "allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of

---

[13] Indeed, although New York invites us to construe Section 518 as being identical to its lapsed federal counterpart if necessary to avoid constitutional difficulties, it never quite abandons the position that Section 518 might apply in the absence of a single sticker price. *See* Appellants' Br. at 61 (noting that a seller's regular price will be its "single posted price" in "the vast majority of cases," but "can also be determined through evidence of how the seller calculates its usual costs and desired profit margins").

[14] In a pure overbreadth challenge based on a statute's application to hypothetical situations not before the court, a determination that the statute is readily susceptible to an interpretation under which it would not cover the hypothetical situations might well end the litigation regardless of the possibility of certification. *See Am. Booksellers Ass'n*, 484 U.S. at 397 ("[I]n determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, *it will be upheld*.") (emphasis added). In such a case, the application of the statute to the challenger's conduct should be clear, *see Fox*, 492 U.S. at 484–85, and we doubt the appropriateness of asking state courts purely hypothetical questions. So to the extent that certification might be appropriate here—which, in any event, we conclude that it is not—it would be appropriate only with respect to Plaintiffs' as-applied challenge.

gaining an authoritative response." *Id.* at 76; *see also Bellotti v. Baird*, 428 U.S. 132, 150–51 (1976); *Osterweil*, 706 F.3d at 144–45. Because of these advantages, this Court has noted that it will generally be preferable "to certify, rather than abstain, wherever it would 'serve the same purpose [as *Pullman*] more efficiently.'" *Nicholson*, 344 F.3d at 168 (alteration in original) (quoting *Serio*, 261 F.3d at 155 (Walker, C.J., concurring)). Still, certification is not "obligatory" even if available, and the decision whether to certify or abstain "rests in the sound discretion of the federal court." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).

Here, we believe that certification is not preferable, primarily because of the way in which this case has been litigated. Were we to certify, Plaintiffs' challenge would be definitively resolved if the New York Court of Appeals were to interpret Section 518 consistently with the lapsed federal surcharge ban. But if the Court of Appeals were to give the statute a different construction, two key questions would remain: (1) whether the statute applies to Expressions Hair Design specifically (a question of state law that we would presumably ask the Court of Appeals to answer), and (2) if so, whether that application violates the First Amendment (a question of federal law that we would answer). Both questions would likely prove difficult in light of the present state of the record, since this case has been litigated

50

almost entirely on the pleadings and the parties have focused their legal analysis primarily on Section 518's application to single-sticker-price sellers. And, in determining whether a seller that posts separate cash and credit-card prices has actually been imposing a forbidden credit-card surcharge, a particularized understanding of how the seller displays its prices and communicates with customers would seem especially important. We will not burden the Court of Appeals with questions that potentially cannot be answered without additional factual development.[15] *Cf. Scribner v. Summers*, 138 F.3d 471, 473 (2d Cir. 1998) ("[W]e would be inclined to certify the question to the New York Court of Appeals should the question be presented on an appropriate record."). Because additional development of the record would be necessary, moreover, one of the primary benefits that certification enjoys over *Pullman* abstention—eliminating the delay and cost of litigating anew in state court—is not as weighty here. Finally, we think there is a minimal risk that any First Amendment rights Expressions Hair Design may be exercising will be compromised by our decision to abstain. It has employed its dual-

---

[15] Indeed, federal courts themselves have declined to consider pre-enforcement as-applied challenges that lack an adequate "foundation." *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 127 (2d Cir. 2014) (quoting *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012)); *see also Justice v. Hosemann*, 771 F.3d 285, 292–95 (5th Cir. 2014); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1022 (9th Cir. 2010).

price scheme without being prosecuted thus far, and New York has, in this case, effectively disavowed any interpretation of Section 518 under which dual-price sellers will be prosecuted simply because their employees happen to *refer* to their pricing schemes as involving a "surcharge."

* * *

In sum: Section 518 does not violate the First Amendment as applied to single-sticker-price sellers. And, because it is unclear whether the law applies outside that specific context, there is no basis for us to conclude that the law violates the First Amendment in any of its applications, much less on its face. As the foregoing discussion illustrates, federal courts can occasionally be an unwise choice of forum for plaintiffs seeking the pre-enforcement invalidation of disfavored state laws. "[R]espect for the place of the States in our federal system" requires no less. *Arizonans for Official English*, 520 U.S. at 75.

**II.**

The district court also erred in holding that Section 518 is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment. A law is void for vagueness if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) lacks

"explicit standards for those who apply [it]." *VIP of Berlin, LLC v. Town of Berlin*, 593

F.3d 179, 186–87, 191 (2d Cir. 2010) (alteration in original) (quoting *Hill v. Colorado*,

530 U.S. 703, 732 (2000), and *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007)).[16]

A vagueness challenge may be either facial or as-applied. *See Farrell v. Burke*, 449

F.3d 470, 495 & n.11 (2d Cir. 2006). Again, we construe Plaintiffs' submissions as

raising a facial challenge to Section 518, as well as an as-applied challenge

concerning the statute's application to two specific pricing schemes: (1) the single-

sticker-price scheme that Plaintiffs say they would like to employ and (2) the dual-

price scheme employed by Expressions Hair Design. These challenges fail for

essentially the same reasons as Plaintiffs' First Amendment challenges.

Under traditional standards governing facial vagueness challenges, a law is

facially unconstitutional only if it is "impermissibly vague in all of its applications."

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). Thus,

"if a statute has a core meaning that can reasonably be understood, then it may

---

[16] The Due Process Clause requires "a greater degree of specificity" where the challenged statute is "capable of reaching expression sheltered by the First Amendment." *VIP of Berlin*, 593 F.3d at 186 (quoting *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006)); *see Smith v. Goguen*, 415 U.S. 566, 573 (1974). Consistent with their argument that Section 518 regulates "pure speech," Plaintiffs contend that this heightened specificity requirement applies in this case. Because we would reject Plaintiffs' challenge regardless of which standard applies, we assume they are correct.

validly be applied to conduct within the core meaning, and the possibility of such a valid application necessarily means that the statute is not vague on its face." *Brache v. Westchester County*, 658 F.2d 47, 51 (2d Cir. 1981); *see also Cunney v. Bd. of Trs. of Vill. of Grand View*, 660 F.3d 612, 623 (2d Cir. 2011).

Here, Section 518 plainly has a "core meaning that can reasonably be understood": sellers who post single sticker prices for their goods and services may not charge credit-card customers an additional amount above the sticker price that is not also charged to cash customers. In other words, Section 518's core meaning is identical to the scope of the lapsed federal surcharge ban. This conclusion follows directly from Section 518's use of the word "surcharge," which means an additional charge above the usual price. We have complete confidence that sellers "of ordinary intelligence" will—if they post single sticker prices—readily understand how to avoid imposing a credit-card surcharge, and that New York authorities will have sufficient guidance in determining whether such sellers have violated the law. Accordingly, Section 518 may validly be applied to single-sticker-price sellers without violating the Due Process Clause; and under the traditional standards governing facial challenges, that means that the statute is not unconstitutionally vague on its face. *See Brache*, 658 F.2d at 51. In other words, Plaintiffs' as-applied

54

challenge involving single-sticker-price sellers fails, so under traditional standards, their facial challenge fails as well. *See Farrell*, 449 F.3d at 485 (noting that "the permissibility of a facial challenge sometimes depends upon whether the challenged regulation was constitutional as applied to the plaintiff").

The Supreme Court has suggested, however, that another variety of facial vagueness challenge—akin to a First Amendment overbreadth challenge—may be available "in the First Amendment context." *United States v. Williams*, 553 U.S. 285, 304 (2008). In First Amendment cases, the Court has said, "[f]acial vagueness challenges may go forward . . . if the challenged regulation 'reaches a substantial amount of constitutionally protected conduct,'" even if it is not unconstitutionally vague as applied to the challenger. *Farrell*, 449 F.3d at 496 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983)). This formulation is slightly perplexing, largely because the scope of the challenged law is precisely what is at issue in a vagueness challenge. Here, for example, Plaintiffs argue that it is unclear how far Section 518 extends, and thus how much (allegedly) "constitutionally protected conduct" the law reaches. The relevant question, then, appears to be how much constitutionally protected conduct the law *arguably* reaches—that is, whether the law's vagueness will result in "a substantial chilling effect on protected conduct." *Id.* at 497; *see*

55

*Williams*, 553 U.S. at 304 (explaining that plaintiffs are "permitt[ed] . . . to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech"); *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976) (stating that a facial vagueness challenge is available if "the statute's deterrent effect on legitimate expression is . . . 'both real and substantial'" (quoting *Erznoznik*, 422 U.S. at 216)). Without reaching the question whether this species of facial vagueness challenge is otherwise applicable in this context, we agree with New York that Section 518 is readily susceptible to an interpretation under which it would clearly reach *no* constitutionally protected conduct and therefore lack any meaningful chilling effect on such conduct.[17]

---

[17] The Supreme Court recently signaled another arguable departure from the traditional rule that, outside the First Amendment context, a statute is facially invalid only if it is unconstitutionally vague in all of its applications. In *Johnson v. United States*, the Court held that the so-called "residual clause" of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B), was void for vagueness despite the existence of "straightforward cases" in which the clause's application would be clear. 135 S. Ct. 2551, 2560 (2015); *see id.* at 2580–82 (Alito, J., dissenting) (objecting to this aspect of the majority's reasoning). The Court did not articulate a standard for the percentage of cases in which a law's application must be vague in order for it to be facially unconstitutional. A plurality of the Court previously held that under certain circumstances, a statute may be facially unconstitutional if "vagueness permeates [its] text." *United States v. Rybicki*, 354 F.3d 124, 131 (2d Cir. 2003) (en banc) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (plurality opinion)). We need not decide on the correct standard, however, because the narrowing construction described in the text would leave Section 518 with very few, if any, unconstitutionally vague applications.

A statute is unconstitutionally vague only if it cannot be construed in a way that eliminates the vagueness problem. *See Skilling v. United States*, 561 U.S. 358, 403–04 (2010); *United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[C]larity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute . . . ."). Thus, in considering a vagueness challenge to a state statute, a federal court must consider not only how the law is "presently drafted," but also how it has been "construed by the state courts." *Kolender*, 461 U.S. at 358; *see Wainwright v. Stone*, 414 U.S. 21, 22–23 (1973) ("For the purpose of determining whether a statute is too vague and indefinite to constitute valid legislation 'we must take the statute as though it read precisely as the highest court of the State has interpreted it.'" (quoting *Minnesota ex rel. Pearson v. Prob. Court*, 309 U.S. 270, 273 (1940))). And, just as in the First Amendment overbreadth context, if an allegedly vague state law has not yet been construed by the state courts, a federal court must determine whether the law is "reasonably susceptible of constructions that might undercut or modify [the] vagueness attack." *Greater N.Y. Metro. Food Council v. McGuire*, 6 F.3d 75, 77 (2d Cir. 1993) (per curiam) (alteration in original) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 307 (1979)). If the law is susceptible to such a construction,

then the federal court should "abstain to afford the state courts a reasonable opportunity to construe the statute." *Id.*

If the New York courts interpret Section 518 as being identical to the lapsed federal surcharge ban, then the law (as construed) would not be unconstitutionally vague on its face, and it clearly would not apply to dual-price sellers like Expressions Hair Design regardless of what those sellers' employees might say about their pricing schemes. Accordingly, having concluded that Section 518 enjoys a core set of applications in which it is not unconstitutionally vague—namely, its application to sellers who post single sticker prices—we find abstention appropriate in this context also, and therefore do not reach the balance of Plaintiffs' vagueness challenge.

**CONCLUSION**

We have considered Plaintiffs' remaining arguments and find them to be without merit. For the foregoing reasons, we **VACATE** the judgment below and **REMAND** for the dismissal of Plaintiffs' claims.