(Slip Opinion) OCTOBER TERM, 2016 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## EXPRESSIONS HAIR DESIGN ET AL. *v.* SCHNEIDERMAN, ATTORNEY GENERAL OF NEW YORK, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 15–1391. Argued January 10, 2017—Decided March 29, 2017

New York General Business Law §518 provides that "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." Petitioners, five New York businesses and their owners who wish to impose surcharges for credit card use, filed suit against state officials, arguing that the law violates the First Amendment by regulating how they communicate their prices, and that it is unconstitutionally vague. The District Court ruled in favor of the merchants, but the Court of Appeals vacated the judgment with instructions to dismiss. The Court of Appeals concluded that in the context of single-sticker pricing—where merchants post one price and would like to charge more to customers who pay by credit card—the law required that the sticker price be the same as the price charged to credit card users. In that context, the law regulated a relationship between two prices. Relying on this Court's precedent holding that price regulation alone regulates conduct, not speech, the Court of Appeals concluded that §518 did not violate the First Amendment. The Court of Appeals abstained from reaching the merits of the constitutional challenge to pricing practices outside the single-sticker context.

*Held*:

  1. This Court's review is limited to whether §518 is unconstitutional as applied to the particular pricing scheme that, before this Court, petitioners have argued they seek to employ: a single-sticker regime, in which merchants post a cash price and an additional credit card surcharge. Pp. 5–6.

Syllabus

2. Section 518 prohibits the pricing regime petitioners wish to employ. Section 518 does not define "surcharge." Relying on the term's ordinary meaning, the Court of Appeals concluded that a merchant imposes a surcharge when he posts a single sticker price and charges a credit card user more than that sticker price. This Court "generally accord[s] great deference to the interpretation and application of state law by the courts of appeals." *Pembaur* v. *Cincinnati*, 475 U. S. 469, 484, n. 13. Because the interpretation of the Court of Appeals is not "clearly wrong," *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 500, n. 9, this Court follows that interpretation. Pp. 6–8.

3. Section 518 regulates speech. The Court of Appeals concluded that §518 posed no First Amendment problem because price controls regulate conduct, not speech. Section 518, however, is not like a typical price regulation, which simply regulates the amount a store can collect. The law tells merchants nothing about the amount they are allowed to collect from a cash or credit card payer. Instead, it regulates how sellers may communicate their prices. In regulating the communication of prices rather than prices themselves, §518 regulates speech.

Because the Court of Appeals concluded otherwise, it did not determine whether §518 survives First Amendment scrutiny. On remand the Court of Appeals should analyze §518 as a speech regulation. Pp. 8–10.

4. Section 518 is not vague as applied to petitioners. As explained, §518 bans the single-sticker pricing petitioners argue they wish to employ, and "a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim," *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 20. Pp. 10–11.

808 F. 3d 118, vacated and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY, THOMAS, GINSBURG, and KAGAN, JJ., joined. BREYER, J., filed an opinion concurring in the judgment. SOTOMAYOR, J., filed an opinion concurring in the judgment, in which ALITO, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES
_____

No. 15–1391
_____

## EXPRESSIONS HAIR DESIGN, ET AL., PETITIONERS v. ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL OF NEW YORK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[March 29, 2017]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Each time a customer pays for an item with a credit card, the merchant selling that item must pay a transaction fee to the credit card issuer. Some merchants balk at paying the fees and want to discourage the use of credit cards, or at least pass on the fees to customers who use them. One method of achieving those ends is through differential pricing—charging credit card users more than customers using cash. Merchants who wish to employ differential pricing may do so in two ways relevant here: impose a surcharge for the use of a credit card, or offer a discount for the use of cash. In N. Y. Gen. Bus. Law §518, New York has banned the former practice. The question presented is whether §518 regulates merchants' speech and—if so—whether the statute violates the First Amendment. We conclude that §518 does regulate speech and remand for the Court of Appeals to determine in the first instance whether that regulation is unconstitutional.

## I

### A

When credit cards were first introduced, contracts between card issuers and merchants barred merchants from charging credit card users higher prices than cash customers. Congress put a partial stop to this practice in the 1974 amendments to the Truth in Lending Act (TILA). The amendments prohibited card issuers from contractually preventing merchants from giving discounts to customers who paid in cash. See §306, 88 Stat. 1515. The law, however, said nothing about surcharges for the use of credit.

Two years later, Congress refined its dissimilar treatment of discounts and surcharges. First, the 1976 version of TILA barred merchants from imposing surcharges on customers who use credit cards. Act of Feb. 27, 1976, §3(c)(1), 90 Stat. 197. Second, Congress added definitions of the two terms. A discount was "a reduction made from the regular price," while a surcharge was "any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash, check, or similar means." §3(a), *ibid.*

In 1981, Congress further delineated the distinction between discounts and surcharges by defining "regular price." Where a merchant "tagged or posted" a single price, the regular price was that single price. Cash Discount Act, §102(a), 95 Stat. 144. If no price was tagged or posted, or if a merchant employed a two-tag approach—posting one price for credit and another for cash—the regular price was whatever was charged to credit card users. *Ibid.* Because a surcharge was defined as an increase from the regular price, there could be no credit card surcharge where the regular price was the same as the amount charged to customers using credit cards. The effect of all this was that a merchant could violate the surcharge ban only by posting a single price and charging

credit card users more than that posted price.

The federal surcharge ban was short lived. Congress allowed it to expire in 1984 and has not renewed the ban since. See §201, *ibid.* The provision preventing credit card issuers from contractually barring discounts for cash, however, remained in place. With the lapse of the federal surcharge ban, several States, New York among them, immediately enacted their own surcharge bans. Passed in 1984, N. Y. Gen. Bus. Law §518 adopted the operative language of the federal ban verbatim, providing that "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." N. Y. Gen. Bus. Law Ann. §518 (West 2012); see also 15 U. S. C. §1666f(a)(2) (1982 ed.). Unlike the federal ban, the New York legislation included no definition of "surcharge."

In addition to these state legislative bans, credit card companies—though barred from prohibiting discounts for cash—included provisions in their contracts prohibiting merchants from imposing surcharges for credit card use. For most of its history, the New York law was essentially coextensive with these contractual prohibitions. In recent years, however, merchants have brought antitrust challenges to contractual no-surcharge provisions. Those suits have created uncertainty about the legal validity of such contractual surcharge bans. The result is that otherwise redundant legislative surcharge bans like §518 have increasingly gained importance, and increasingly come under scrutiny.

B

Petitioners, five New York businesses and their owners, wish to impose surcharges on customers who use credit cards. Each time one of their customers pays with a credit card, these merchants must pay some transaction fee to the company that issued the credit card. The fee is gener-

ally two to three percent of the purchase price. Those fees add up, and the merchants allege that they pay tens of thousands of dollars every year to credit card companies. Rather than increase prices across the board to absorb those costs, the merchants want to pass the fees along only to their customers who choose to use credit cards. They also want to make clear that they are not the bad guys—that the credit card companies, not the merchants, are responsible for the higher prices. The merchants believe that surcharges for credit are more effective than discounts for cash in accomplishing these goals.

In 2013, after several major credit card issuers agreed to drop their contractual surcharge prohibitions, the merchants filed suit against the New York Attorney General and three New York District Attorneys to challenge §518—the only remaining obstacle to their charging surcharges for credit card use. As relevant here, they argued that the law violated the First Amendment by regulating how they communicated their prices, and that it was unconstitutionally vague because liability under the law "turn[ed] on the blurry difference" between surcharges and discounts. App. 39, Complaint ¶51.

The District Court ruled in favor of the merchants. It read the statute as "draw[ing a] line between prohibited 'surcharges' and permissible 'discounts' based on words and labels, rather than economic realities." 975 F. Supp. 2d 430, 444 (SDNY 2013). The court concluded that the law therefore regulated speech, and violated the First Amendment under this Court's commercial speech doctrine. In addition, because the law turned on the "virtually incomprehensible distinction between what a vendor can and cannot tell its customers," the District Court found that the law was unconstitutionally vague. *Id.,* at 436.

The Court of Appeals for the Second Circuit vacated the judgment of the District Court with instructions to dismiss the merchants' claims. It began by considering single-

sticker pricing, where merchants post one price and would like to charge more to customers who pay by credit card. All the law did in this context, the Court of Appeals explained, was regulate a relationship between two prices— the sticker price and the price charged to a credit card user—by requiring that the two prices be equal. Relying on our precedent holding that price regulation alone regulates conduct, not speech, the Court of Appeals concluded that §518 did not violate the First Amendment.

The court also considered other types of pricing regimes—for example, posting separate cash and credit prices. The Court of Appeals thought it "far from clear" that §518 prohibited such pricing schemes. 808 F. 3d 118, 137 (CA2 2015). The federal surcharge ban on which §518 was modeled did not apply outside the single-sticker context, and the merchants had not clearly shown that §518 had a "broader reach" than the federal law. *Ibid.* Deciding that petitioners' challenge in this regard "turn[ed] on an unsettled question of state law," the Court of Appeals abstained from reaching the merits of the constitutional question beyond the single-sticker context. *Id.,* at 135 (citing *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496 (1941)).

We granted certiorari. 579 U. S. \_\_\_ (2016).

II

As a preliminary matter, we note that petitioners present us with a limited challenge. Observing that the merchants were not always particularly clear about the scope of their suit, the Court of Appeals deemed them to be bringing a facial attack on §518 as well as a challenge to the application of the statute to two particular pricing regimes: single-sticker pricing and two-sticker pricing. Before us, however, the merchants have disclaimed a facial challenge, assuring us that theirs is an as-applied challenge only. See Tr. of Oral Arg. 4–5, 18.

There remains the question of what precise application of the law they seek to challenge. Although the merchants have presented a wide array of hypothetical pricing regimes, they have expressly identified only one pricing scheme that they seek to employ: posting a cash price and an additional credit card surcharge, expressed either as a percentage surcharge or a "dollars-and-cents" additional amount. See, *e.g.*, App. 101–102, 104; Tr. of Oral Arg. 4–5, 18. Under this pricing approach, petitioner Expressions Hair Design might, for example, post a sign outside its salon reading "Haircuts $10 (we add a 3% surcharge if you pay by credit card)." Or, petitioner Brooklyn Farmacy & Soda Fountain might list one of the sundaes on its menu as costing "$10 (with a $0.30 surcharge for credit card users)." We take petitioners at their word and limit our review to the question whether §518 is unconstitutional as applied to this particular pricing practice.[1]

## III

The next question is whether §518 prohibits the pricing regime petitioners wish to employ. The Court of Appeals concluded that it does. The court read "surcharge" in §518 to mean "an additional amount above the seller's regular

_____

[1] Petitioner Expressions Hair Design currently posts separate dollars-and-cents prices for cash and credit—that is, it posts something like "$10 cash, $10.30 credit." It displays its prices in this way, however, only because it considers itself compelled to do so by the challenged law if it wants to charge different prices. Prior to becoming aware of the law, Expressions posted single prices along with a notice informing customers that a three percent surcharge would be added to their bill if they paid by credit card. Expressions has indicated that it would prefer to return to its prior practice. See App. 19, Complaint ¶3; *id.*, at 103–104. Given petitioners' representations about the narrow scope of their as-applied challenge, we limit our consideration to the single-sticker pricing regime for present purposes. Petitioners' affidavits and briefing reference other potential pricing schemes, which may be considered by the Court of Appeals to the extent it deems appropriate. See, *e.g.*, *id.*, at 56; Brief for Petitioners 50.

price," and found it "basically self-evident" how §518
applies to sellers who post a single sticker price: "the
sticker price is the 'regular' price, so sellers may not
charge credit-card customers an additional amount above
the sticker price that is not also charged to cash custom-
ers." 808 F. 3d, at 128. Under this interpretation, signs of
the kind that the merchants wish to post—"$10, with a
$0.30 surcharge for credit card users"—violate §518 be-
cause they identify one sticker price—$10—and indicate
that credit card users are charged more than that amount.

"We generally accord great deference to the interpreta-
tion and application of state law by the courts of appeals."
*Pembaur* v. *Cincinnati*, 475 U. S. 469, 484, n. 13 (1986).
This deference is warranted to "render unnecessary review
of their decisions in this respect" and because lower fed-
eral courts "are better schooled in and more able to interpret
the laws of their respective States." *Brockett* v. *Spokane
Arcades, Inc.*, 472 U. S. 491, 500 (1985) (quoting *Cort* v.
*Ash*, 422 U. S. 66, 73, n. 6 (1975); internal quotation
marks omitted). "[W]e surely have the authority to differ
with the lower federal courts as to the meaning of a state
statute," and have done so in instances where the lower
court's construction was "clearly wrong" or "plain error."
472 U. S., at 500, and n. 9 (internal quotation marks
omitted). But that is not the case here. Section 518 does
not define "surcharge," but the Court of Appeals looked to
the ordinary meaning of the term: "a charge in excess of
the usual or normal amount." 808 F. 3d, at 127 (quoting
Webster's Third New International Dictionary 2299
(2002); internal quotation marks omitted). Where a seller
posts a single sticker price, it is reasonable to treat that
sticker price as the "usual or normal amount" and con-
clude, as the court below did, that a merchant imposes a
surcharge when he charges a credit card user more than
that sticker price. In short, we cannot dismiss the Court
of Appeals' interpretation of §518 as "clearly wrong."

Accordingly, consistent with our customary practice, we follow that interpretation.

## IV

Having concluded that §518 bars the pricing regime petitioners wish to employ, we turn to their constitutional arguments: that the law unconstitutionally regulates speech and is impermissibly vague.

## A

The Court of Appeals concluded that §518 posed no First Amendment problem because the law regulated conduct, not speech.[2] In reaching this conclusion, the Court of Appeals began with the premise that price controls regulate conduct alone. See *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484, 507 (1996) (plurality opinion); *id.,* at 524 (THOMAS, J., concurring in part and concurring in judgment); *id.,* at 530 (O'Connor, J., concurring in judgment). Section 518 regulates the relationship between "(1) the seller's sticker price and (2) the price the seller charges to credit card customers," requiring that these two amounts be equal. 808 F. 3d, at 131. A law regulating the relationship between two prices regulates speech no more than a law regulating a single price. The Court of Appeals concluded that §518 was therefore simply a conduct regulation.

But §518 is not like a typical price regulation. Such a regulation—for example, a law requiring all New York delis to charge $10 for their sandwiches—would simply regulate the amount that a store could collect. In other

————————

[2] Relying fully on their claim that §518 regulated speech, petitioners did not advance any argument before the Court of Appeals that §518 was constitutionally problematic even if deemed a regulation of conduct. See 808 F. 3d 118, 135 (CA2 2015) (noting that petitioners had not challenged §518 under *United States* v. *O'Brien*, 391 U. S. 367 (1968)).

words, it would regulate the sandwich seller's conduct. To be sure, in order to actually collect that money, a store would likely have to put "$10" on its menus or have its employees tell customers that price. Those written or oral communications would be speech, and the law—by determining the amount charged—would indirectly dictate the content of that speech. But the law's effect on speech would be only incidental to its primary effect on conduct, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 62 (2006) (quoting *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 502 (1949); internal quotation marks omitted); see also *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 567 (2011).

Section 518 is different. The law tells merchants nothing about the amount they are allowed to collect from a cash or credit card payer. Sellers are free to charge $10 for cash and $9.70, $10, $10.30, or any other amount for credit. What the law does regulate is how sellers may communicate their prices. A merchant who wants to charge $10 for cash and $10.30 for credit may not convey that price any way he pleases. He is not free to say "$10, with a 3% credit card surcharge" or "$10, plus $0.30 for credit" because both of those displays identify a single sticker price—$10—that is less than the amount credit card users will be charged. Instead, if the merchant wishes to post a single sticker price, he must display $10.30 as his sticker price. Accordingly, while we agree with the Court of Appeals that §518 regulates a relationship between a sticker price and the price charged to credit card users, we cannot accept its conclusion that §518 is nothing more than a mine-run price regulation. In regulating the communication of prices rather than prices themselves,

§518 regulates speech.

Because it concluded otherwise, the Court of Appeals had no occasion to conduct a further inquiry into whether §518, as a speech regulation, survived First Amendment scrutiny. On that question, the parties dispute whether §518 is a valid commercial speech regulation under *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), and whether the law can be upheld as a valid disclosure requirement under *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985).

"[W]e are a court of review, not of first view." *Nautilus, Inc.* v. *Biosig Instruments, Inc.*, 572 U. S. ___, ___ (2014) (slip op., at 14) (internal quotation marks omitted). Accordingly, we decline to consider those questions in the first instance. Instead, we remand for the Court of Appeals to analyze §518 as a speech regulation.[3]

B

Given the way the merchants have presented their case, their vagueness challenge gives us little pause. Before this Court, the only pricing practice they express an interest in employing is a single-sticker regime, listing one price and a separate surcharge amount. As we have explained, §518 bars them from doing so. "[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim." *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 20 (2010). Although the merchants argue that "no one can seem to put a finger on just how far the law sweeps," Brief for Petitioners 51, it is at least clear

_____

[3] To assess the statute's constitutionality, the Court of Appeals may need to consider a question we need not answer here: whether the statute permits two-sticker pricing schemes like the one petitioner Expressions currently uses, see n. 1, *supra*. Respondents' argument that §518 is a constitutionally valid disclosure requirement rests on an interpretation of the statute that allows such two-sticker schemes.

that §518 proscribes their intended speech.  Accordingly, the law is not vague as applied to them.[4]

## C

The judgment of the Court of Appeals for the Second Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

––––––––––

[4] For similar reasons, petitioners' related argument regarding abstention is no longer at issue.  The Court of Appeals abstained from deciding whether §518 was constitutional outside of the single-sticker context, but the merchants have disavowed any intent to challenge the law outside of this context.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1391

_____

EXPRESSIONS HAIR DESIGN, ET AL., PETITIONERS *v.*
ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL OF
NEW YORK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 29, 2017]

JUSTICE BREYER, concurring in the judgment.

I agree with the Court that New York's statute regulates speech. But that is because virtually all government regulation affects speech. Human relations take place through speech. And human relations include community activities of all kinds—commercial and otherwise.

When the government seeks to regulate those activities, it is often wiser not to try to distinguish between "speech" and "conduct." See R. Post, Democracy, Expertise, and Academic Freedom 3–4 (2012). Instead, we can, and normally do, simply ask whether, or how, a challenged statute, rule, or regulation affects an interest that the First Amendment protects. If, for example, a challenged government regulation negatively affects the processes through which political discourse or public opinion is formed or expressed (interests close to the First Amendment's protective core), courts normally scrutinize that regulation with great care. See, *e.g., Boos* v. *Barry*, 485 U. S. 312, 321 (1988). If the challenged regulation restricts the "informational function" provided by truthful commercial speech, courts will apply a "lesser" (but still elevated) form of scrutiny. *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 563–564 (1980). If, however, a challenged regulation simply

requires a commercial speaker to disclose "purely factual and uncontroversial information," courts will apply a more permissive standard of review. *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 651 (1985). Because that kind of regulation normally has only a "minimal" effect on First Amendment interests, it normally need only be "reasonably related to the State's interest in preventing deception of consumers." *Ibid.* Courts apply a similarly permissive standard of review to "regulatory legislation affecting ordinary commercial transactions." *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152 (1938). Since that legislation normally does not significantly affect the interests that the First Amendment protects, we normally look only for assurance that the legislation "rests upon some rational basis." *Ibid.*

I repeat these well-known general standards or judicial approaches both because I believe that determining the proper approach is typically more important than trying to distinguish "speech" from "conduct," see *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 582 (2011) (BREYER, J., dissenting), and because the parties here differ as to which approach applies. That difference reflects the fact that it is not clear just what New York's law does. On its face, the law seems simply to tell merchants that they cannot charge higher prices to credit-card users. If so, then it is an ordinary piece of commercial legislation subject to "rational basis" review. See *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484, 507 (1996) (opinion of Stevens, J.). It may, however, make more sense to interpret the statute as working like the expired federal law that it replaced. If so, it would require a merchant, who posts prices and who wants to charge a higher credit-card price, simply to disclose that credit-card price. See 15 U. S. C. §§1602(q), (x), 1666f(a)(2) (1982 ed.); see also *post*, at 9 (SOTOMAYOR, J., concurring in judgment). In that case, though affecting the merchant's "speech," it would not hinder the transmis-

sion of information to the public; the merchant would remain free to say whatever it wanted so long as it also revealed its credit-card price to customers. Accordingly, the law would still receive a deferential form of review. See *Zauderer, supra*, at 651.

Nonetheless, petitioners suggest that the statute does more. See, *e.g.,* Brief for Petitioners 28 (arguing that the statute forbids "[f]raming the price difference . . . as a credit surcharge"). Because the statute's operation is unclear and because its interpretation is a matter of state law, I agree with the majority that we should remand the case to the Second Circuit. I also agree with JUSTICE SOTOMAYOR that on remand, it may well be helpful for the Second Circuit to ask the New York Court of Appeals to clarify the nature of the obligations the statute imposes. See N. Y. Comp. Code, Rules & Regs., tit. 22, Rule 500.27(a) (2016) (permitting "any United States Court of Appeals" to certify "dispositive questions of [New York] law to the [New York] Court of Appeals").

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1391

_____

EXPRESSIONS HAIR DESIGN, ET AL., PETITIONERS *v.*
ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL OF
NEW YORK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 29, 2017]

JUSTICE SOTOMAYOR, with whom JUSTICE ALITO joins,
concurring in the judgment.

The Court addresses only one part of one half of peti-
tioners' First Amendment challenge to the New York
statute at issue here. This quarter-loaf outcome is worse
than none. I would vacate the judgment below and re-
mand with directions to certify the case to the New York
Court of Appeals for a definitive interpretation of the
statute that would permit the full resolution of petitioners'
claims. I thus concur only in the judgment.

I

New York prohibits its merchants from "impos[ing] a
surcharge on a [customer] who elects to use a credit card
in lieu of payment by cash, check, or similar means." N. Y.
Gen. Bus. Law Ann. §518 (West 2012). A merchant who
violates this prohibition commits a misdemeanor and risks
"a fine not to exceed five hundred dollars or a term of
imprisonment up to one year, or both." *Ibid.*

A

Section 518 can be interpreted in several ways. On first
read, its prohibition on "impos[ing] a surcharge" on credit
card customers appears to prohibit charging customers who
pay with a credit card more than those who pay by other

means.  See Black's Law Dictionary 1579 (9th ed. 2009)
("surcharge" means "[a]n additional tax, charge, or cost").
That is, §518 may require a merchant to charge all cus-
tomers the same price, no matter the form of payment.

An earlier federal law containing an almost identical
prohibition muddies the path to this plain text reading.  A
1976 amendment to the Truth in Lending Act set out a
temporary prohibition barring a "seller in any sales trans-
action" from "impos[ing] a surcharge on a cardholder who
elects to use a credit card in lieu of payment by cash,
check, or similar means."  §3(c)(1), 90 Stat. 197.  The
amendment also defined a "surcharge" as "any means of
increasing the regular price to a cardholder which is not
imposed upon customers paying by cash, check, or similar
means." §3(a), *ibid.*  "[R]egular price" was later defined to
mean the displayed price if a merchant displayed only one
price or the credit card price if the merchant either did not
display prices or displayed both cash and credit card prices.
§102(a), 95 Stat. 144.  Under that definition, a merchant
violated the federal prohibition on "impos[ing] a sur-
charge" by displaying in dollars-and-cents form only one
price—the cash price—and then charging credit card
customers a higher price.[1]

When the federal law lapsed in 1984, New York enacted
§518, which sets out the same ban on "impos[ing] a sur-
charge."  New York borrowed the federal prohibition al-
most verbatim.  But it chose, without explanation, not to
borrow the federal definitions or to enact clarifying defini-
tions of its own.

The difference between the laws leaves §518 open to at
least three interpretations.  It could be read in line with
its plain text to require that a merchant charge the same

---

[1] This is the interpretation of the lapsed federal ban offered by the
United States and accepted by the majority.  For purposes of this
opinion, I assume that this interpretation is correct.

price to all his customers.  It could be read in line with the lapsed federal ban to permit a merchant to charge different prices to cash and credit card customers but to prohibit a merchant from displaying in dollars-and-cents form only the cash price and then charging credit card customers a higher price.  On this reading, §518 would not apply where a merchant displays in dollars-and-cents form only the credit card price and then charges a lower price to cash customers, or where a merchant displays both the cash and credit card prices in dollars-and-cents form.  Or it could be read more broadly, based on the omission of the definitions that had limited the federal ban's scope.  On this reading, §518 might prohibit a merchant from characterizing the difference between the cash and credit card prices as a "surcharge," no matter how he displays his prices.[2]

——————

[2] Section 518's sparse enforcement history does not clear up the ambiguity.  New York has pursued one §518 prosecution, which resulted in a conviction later set aside on appeal.  The decision supports, but does not require, giving §518 a broader reading than the lapsed federal ban. See *People* v. *Fulvio*, 136 Misc. 2d 334, 344–345, 517 N. Y. S. 2d 1008, 1015 (1987) (stating that §518 permits a conviction for being "careless enough to describe the higher price in terms which amount to the 'credit price' having been derived from adding a charge to the lower price" (emphasis deleted)).  A more recent enforcement spree is more opaque.  A group of merchants state that when a customer called asking for their prices, they would quote the cash price and tell the customers they charged, for example, "a $.05 surcharge" for payment with a credit card.  See, *e.g.,* App. 107.  They state that in 2009 the New York Attorney General's Office told them that they had violated §518, directed them to stop, and explained that they could comply with §518 by quoting the credit card price and offering a "discoun[t]" for payment with cash.  *Ibid.*  While these merchants' acts would have violated the lapsed federal ban—by stating a single cash price and then charging a higher price to credit card customers—the recent enforcement actions do not demonstrate that §518 prohibits only those acts and stretches no further.  And because the New York attorney general lacks the authority to adopt an interpretation of §518 that binds other prosecutorial entities in the State, these enforcement actions speak only to how the

Confirming the elusive nature of §518, New York has pressed almost all of these interpretations during this litigation.  Before the District Court, it viewed §518 as mirroring the lapsed federal ban.  See 975 F. Supp. 2d 430, 442 (SDNY 2013).  Before the Second Circuit, it of- fered the lapsed federal ban as a narrowing interpretation, thus suggesting that §518 applies more broadly than that provision.  See 808 F. 3d 118, 140, n. 13 (2015).  And be- fore this Court, it explained that other prosecutorial enti- ties in New York are not bound by its interpretation of §518 (or the interpretations of the state district attorneys who are parties to this case), leaving open the possibility of still other interpretations.  See Tr. of Oral Arg. 40.[3]

## B

Petitioners here are five New York merchants.  When a customer pays with a credit card, petitioners (like all merchants) are charged a processing fee by the card issuer. Petitioners want to pass that fee on to their credit card paying customers, but not their cash paying customers. They want to charge cash customers one price and credit card customers a higher price that includes the processing fee.  One petitioner, Expressions Hair Design, currently does pass the costs of credit card processing fees on to its credit card paying customers.  The other four charge one price to all customers.  They set their prices to account for the processing fees they predict they will incur.

All five would prefer to use a different pricing system or display than the ones they use now.  Expressions Hair Design and Five Points Academy would like to charge cash and credit card customers two different prices and to

_____

attorney general may interpret §518.  See Tr. of Oral Arg. 40–41.

[3] The multiple available interpretations of §518 do not render §518 so vague as to violate the Due Process Clause.  But they do render §518 ambiguous enough to warrant asking the New York Court of Appeals to resolve the statute's meaning.

display a dollars-and-cents cash price alongside the extra charge for credit card customers—say, "$100 with a 3% credit card charge" or "$100 with a $3 credit card charge." Brooklyn Farmacy & Soda Fountain, Brite Buy Wines & Spirits, and Patio.com want to charge cash and credit card customers two different prices and to characterize the difference in prices as a "surcharge" when they display or convey their prices to customers. App. 47–48, 51, 57.

All five do not use their preferred pricing systems or displays for fear of violating §518. Expressions Hair Design and Five Points Academy believe §518 prohibits their pricing display because it would convey the credit card processing costs impermissibly as a surcharge, rather than permissibly as a discount—say, "$103 with a 3% discount for cash payment" or "$103 with a $3 discount for cash payment." The other three petitioners believe that §518 regulates how they can describe the difference between cash and credit card prices. Because §518 does not, in their view, clearly state just how it regulates those descriptions, they have decided that the uncertainty counsels against a change.

Petitioners view §518 as an unconstitutional restriction on their ability to display and describe their prices to their customers. And so they sued and challenged the law on First Amendment grounds.

## II

Resolving petitioners' challenge to §518 requires an accurate picture of how, exactly, the statute works. That understanding is needed both to decide whether §518 prohibits petitioners' preferred pricing systems and displays and, if so, whether that prohibition is consistent with the First Amendment. See 808 F. 3d, at 141; *ante,* at 10, n. 3.

But the Second Circuit did not decide just how far §518 extends. It instead decided how §518 applies to part of the

petitioners' challenge—the pricing display Expressions Hair Design and Five Points Academy wish to use—and declined to decide how, or even if, §518 applies to the rest of the challenge. While §518 evades easy interpretation, a partial decision was neither required nor right. The court below erred by not asking the New York Court of Appeals for a definitive interpretation of §518, and this Court errs by not correcting it.

## A

Given a constitutional challenge that turned on the interpretation of an ambiguous state statute not yet definitively interpreted by the state courts, the Second Circuit faced a problem. Any interpretation it gave §518 would not be authoritative since state courts, not federal courts, have the final word on the interpretation of state statutes. But it had before it two routes—abstention and certification—to a solution. Both would have allowed it to secure an authoritative interpretation of §518 before resolving the constitutional challenge.

In this context, abstention and certification serve the same goals. Both recognize that when the outcome of a constitutional challenge turns on the proper interpretation of state law, a federal court's resolution of the constitutional question may turn out to be unnecessary. The state courts could later interpret the state statute differently. And the state court's different interpretation might result in a statute that implicates no constitutional question, or that renders the federal court's constitutional analysis irrelevant. See, *e.g., Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 79 (1997); *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 507–509 (1985) (O'Connor, J., concurring). Abstention and certification avoid this risk by deferring a federal court's decision on the constitutionality of the state statute until a state court has authoritatively resolved the antecedent state-law question.

Abstention is a blunt instrument. Under *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496 (1941), a federal court's decision to abstain sends the plaintiff to state court. Once the plaintiff obtains the state courts' views on the statute, he may return to federal court, state-court decision in hand, for resolution of the constitutional question. *Pullman* abstention thus "entail[s] a full round of litigation in the state court system before any resumption of proceedings in federal court." *Arizonans for Official English*, 520 U. S., at 76.

Certification offers a more precise tool. In States that have authorized certification, a federal court may "put the [state-law] question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response." *Ibid.* The rule relevant here is typical of certification statutes. New York allows a federal court of appeals to certify "determinative questions of New York law . . . involved in a case pending before that court for which no controlling precedent of the Court of Appeals exists . . . to the [New York] Court of Appeals." N. Y. Comp. Code, Rules & Regs., tit. 22, Rule 500.27(a) (2016).[4]

———————

[4] The New York Court of Appeals regularly accepts and answers certified questions. See, *e.g., Flo & Eddie, Inc.* v. *Sirius XM Radio, Inc.*, 28 N. Y. 3d 583, ___ N. E. 3d ___ (Dec. 20, 2016) (certified Apr. 13, 2016); *Pasternack* v. *Laboratory Corp. of Am. Holdings*, 27 N. Y. 3d 817, 59 N. E. 3d 485 (June 30, 2016) (certified Nov. 17, 2015); *Matter of Viking Pump, Inc.*, 27 N. Y. 3d 244, 52 N. E. 3d 1144 (May 3, 2016) (certified June 10, 2015); *Beck Chevrolet Co.* v. *General Motors LLC*, 27 N. Y. 3d 379, 53 N. E. 3d 706 (May 3, 2016) (certified May 19, 2015); *Ministers & Missionaries Benefit Bd.* v. *Snow*, 26 N. Y. 3d 466, 45 N. E. 3d 917 (Dec. 15, 2015) (certified Mar. 5, 2015). The Second Circuit has "actively and vigorously employed" certification. Kaye, Tribute to Judge Guido Calabresi, 70 N. Y. U. Annual Survey Am. L. 33, 34 (2014) (noting, based on service as the Chief Judge of the New York Court of Appeals, that certification by the Second Circuit "has done an enormous amount to bridge the gap between our state and federal court systems").

While the decision to certify "rests in the sound discretion of the federal court," *Lehman Brothers* v. *Schein*, 416 U. S. 386, 391 (1974), this Court has repeatedly emphasized that certification offers clear advantages over abstention. "[M]ere difficulty in ascertaining local law is no excuse for" abstaining and "remitting the parties to a state tribunal for the start of another lawsuit." *Id.*, at 390. Keeping the case, waiting for an answer on the certified question, and then fully resolving the issues "in the long run save[s] time, energy, and resources and helps build a cooperative judicial federalism." *Id.,* at 391. As a result, "the availability of certification greatly simplifies the analysis" of whether to abstain. *Bellotti* v. *Baird*, 428 U. S. 132, 151 (1976); see also *Arizonans for Official English*, 520 U. S., at 75 ("Certification today covers territory once dominated by a deferral device called *Pullman* abstention" (internal quotation marks omitted)). And this Court has described abstention as particularly problematic where, as here, a challenge to a state statute rests on the First Amendment. Cf. *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 396 (1988) ("Certification, in contrast to the more cumbersome and (in this context) problematic abstention doctrine, is a method by which we may expeditiously obtain that construction"); *Houston* v. *Hill*, 482 U. S. 451, 467–468 (1987).

The court below chose a convoluted course: It rejected certification, abstained in part, and decided the question in part. It did so by dividing petitioners' challenge into two parts. As to the first part, it held that §518 did prohibit the pricing display that Expressions Hair Design and Five Points Academy prefer: displaying the cash price alongside the credit card charge.[5] It found this application

---

[5] The court below did not truly engage with the plain text reading of §518, under which a merchant may not charge different prices to cash and credit card customers. See 808 F. 3d 118, 128 (CA2 2015). It is

of §518 consistent with the First Amendment. See 808 F. 3d, at 130. As to the second part, it declined to address whether §518 speaks to, or unconstitutionally restricts, how petitioners who wish to display both the cash and credit card prices in dollars-and-cents form can describe the difference between those prices. See *id.,* at 136. It doubted whether §518 did reach that broadly and assumed that, even if it did, the New York state courts would construe the statute more narrowly—in line with the lapsed federal provision. And so the court declined to certify the question and chose instead to abstain from deciding this part of petitioners' challenge. See *id.*, at 137–139. It did so even though New York, responsible for enforcing §518, had "never quite abandon[ed]" its position that §518 might reach more broadly than the lapsed federal provision. *Id.,* at 140, n. 13.

The Second Circuit should have exercised its discretion to certify the antecedent state-law question here: What pricing schemes or pricing displays does §518 prohibit? Certification might have avoided the need for a constitutional ruling altogether. If the state court reads §518 only as a price regulation, no constitutional concerns are implicated. Compare *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484, 507 (1996) (plurality opinion) ("direct regulation" of prices does "not involve any restriction on speech"), with *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 761 (1976) (price advertisements contain protected speech because they convey a merchant's "'idea'" that "'I will sell you the X prescription drug at the Y price'"). Or certification might have limited the scope of the constitutional challenge in the case. If the state court reads §518 to mirror the lapsed federal ban, that would eliminate the need for a

_____

free to consider that reading on remand in light of the Court's constitutional holding.

SOTOMAYOR, J., concurring in judgment

constitutional ruling on the second part of petitioners' challenge (premised on a reading of §518 that prohibits more than the lapsed federal ban). At the very least, certification would have allowed the court to resolve petitioners' entire challenge in one go.

The Second Circuit declined to exercise its discretion to certify because it viewed the "state of the record" as too underdeveloped. 808 F. 3d, at 141. It thought that the New York Court of Appeals could not interpret §518, and that it could not resolve the challenge to §518, based on that record. Both issues are pure questions of law: whether §518 prohibits petitioners' preferred pricing systems and displays (a statutory interpretation question for the New York Court of Appeals) and whether §518 survives petitioners' First Amendment challenge (a constitutional question for the Second Circuit). And both issues turn on only a limited set of facts—the pricing systems and displays that petitioners wish to use. As discussed above, the record contains those facts. The "state of the record" thus does not counsel against certification. Given the significant benefits certification offered and given the absence of persuasive downsides identified by the Second Circuit, the decision not to certify was an abuse of discretion.

B

The consequences of the decision not to certify reverberate throughout the Court's opinion today. For lack of a definitive interpretation of §518, it chooses to address only the first part of petitioners' challenge and to defer to the Second Circuit's partial interpretation of §518.[6] *Ante,* at

———————

[6] It does so by invoking an interpretive rule of deference to a lower federal court's construction of the law of a State within its jurisdiction, in line with the general principle that this Court does not resolve issues of state law. I do not read the Court's deference to the Second Circuit as holding that this Court will defer to a lower federal court's interpretation of state law even where doing so would cast serious constitutional

6–8. It then holds that §518 does restrict constitutionally protected speech. *Ante,* at 8–10. But it does not decide whether §518's restriction is constitutionally permissible because doing so would require it to answer the ever-present question in this case: "whether the statute permits . . . pricing schemes like the one . . . Expressions currently uses." *Ante,* at 10, n. 3. And so it sends this case back to the Second Circuit for further proceedings. *Ante,* at 10.

## III

"The complexity" of this case "might have been avoided," *Arizonans for Official English*, 520 U. S., at 79, had the Second Circuit certified the question of §518's meaning when the case was first before it. The Court's opinion does not foreclose the Second Circuit from choosing that route on remand. But rather than contributing to the piecemeal resolution of this case, I would vacate the judgment below and remand with instructions to certify the case to the New York Court of Appeals to allow it to definitively interpret §518. I thus concur only in the judgment.

---

doubt on, or invalidate, a state law. Such a rule would be incorrect. See *Frisby* v. *Schultz*, 487 U. S. 474, 483 (1988) (describing lower courts' interpretation as "plain error . . . [t]o the extent they endorsed a broad reading of the" law at issue because "the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties"). The Court's silence on the relevance of the avoidance canon to the Second Circuit's interpretation is consistent with an unexpressed conclusion, with which I disagree, that no narrowing construction is available that would avoid constitutional concerns or that a broader constriction raises no constitutional concerns.